UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: March 7, 2017　Decided: July 14, 2017)

Docket No. 16-1271

—————————————————

JOANNE FRATELLO,
*Plaintiff-Appellant*,

v.

ARCHDIOCESE OF NEW YORK, ST. ANTHONY'S SHRINE CHURCH,
AND ST. ANTHONY'S SCHOOL,
*Defendants-Appellees*.[*]

—————————————————

Before:　　SACK and LOHIER, *Circuit Judges*, and WOODS, *District Judge*.[**]

The plaintiff is a former principal of a Roman Catholic school who claims that she was terminated from that position on the basis of unlawful gender discrimination and retaliation. The sole question on appeal is whether the United States District Court for the Southern District of New York (Cathy Seibel,

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

[**] Judge Gregory H. Woods, of the United States District Court for the Southern District of New York, sitting by designation.

*Judge*) erred in awarding the defendants summary judgment on the ground that the plaintiff's employment-discrimination claims are barred by the "ministerial exception," a doctrine based on the First Amendment that precludes such claims by "ministers" against the religious groups that employ them. We conclude that the plaintiff's claims are barred because she is a minister within the meaning of the exception. Although her formal title was not inherently religious, the record reflects that, as part of her job responsibilities, she held herself out as a spiritual leader of the school and performed many religious functions to advance its religious mission. Accordingly, the district court's judgment is:

AFFIRMED.

MICHAEL DAVID DIEDERICH, JR., Stony Point, NY, *for Plaintiff-Appellant*.

ERIC C. RASSBACH (Lori Halstead Windham, Daniel H. Blomberg; James P. McCabe, Roderick J. Cassidy, Archdiocese of New York, New York, NY; Kenneth A. Novikoff, Barry I. Levy, Rivkin Radler LLP, Uniondale, NY, *on the brief*), The Becket Fund for Religious Liberty, Washington, D.C., *for Defendants-Appellees*.

Leslie Griffin, UNLV William S. Boyd School of Law, Las Vegas, NV (*on the brief*), *for amici curiae Call to Action, DignityUSA, FutureChurch, The National Coalition of American Nuns, New Ways Ministry, and Voice of the Faithful*.

Stephen Bergstein, Bergsten & Ullrich, LLP, New Paltz, NY (*on the brief*), *for amicus curiae National Employment Lawyers Association/New York.*

Victoria Dorfman, Todd Geremia, Lauren Pardee Ruben, Jones Day, New York, NY (*on the brief*), *for amici curiae Douglas Laycock, Michael W. McConnell, Thomas C. Berg, Carl H. Esbeck, Richard W. Garnett, Paul Horwitz, and John D. Inazu.*

Paul J. Zidlicky, Sidley Austin LLP, Washington, D.C. (*on the brief*), *for amici curiae Carmelite Sisters of the Most Sacred Heart of Los Angeles and Sisters of the Presentation of the Blessed Virgin Mary.*

Erik W. Stanley, Jeremiah Galus, Alliance Defending Freedom, Scottsdale, AZ (*on the brief*), *for amicus curiae Orthodox Church in America.*

SACK, *Circuit Judge*:

Plaintiff-appellant Joanne Fratello, former principal of a Roman Catholic school, alleges that she was terminated from that position on the basis of unlawful gender discrimination and retaliation. The defendants—the school, the church, and the archdiocese—moved for summary judgment on the ground that these claims are barred by the "ministerial exception," a doctrine that precludes, on First Amendment grounds, employment-discrimination claims by "ministers" against the religious organizations that employ or formerly employed them. The

United States District Court for the Southern District of New York (Cathy Seibel, *Judge*) awarded the defendants summary judgment on that basis. The sole question on appeal is whether Fratello is a "minister" within the meaning of the exception, a conclusion that would preclude her employment-discrimination claims against the defendants.

Although we have previously recognized a ministerial exception for employment-discrimination claims, this is our first occasion to address the doctrine since the Supreme Court's unanimous decision in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012) (recognizing a ministerial exception for employment-discrimination claims). In light of that decision, we conclude that in determining whether the ministerial exception bars an employment-discrimination claim against a religious organization, the only question is whether the employee qualifies as a "minister" within the meaning of the exception. *See id.* at 190-91. In this regard, *Hosanna-Tabor* instructs us to assess a broad array of relevant "considerations," including but not limited to (1) the employee's "formal title," (2) "the substance reflected in that title," (3) the employee's "use of th[e] title," and (4) "the important religious functions she performed." *Id.* at 192.

Applying these principles here, we conclude that the ministerial exception bars Fratello's employment-discrimination claims because in her role as principal she was a minister within the meaning of the exception. Although her formal title was not inherently religious, we think that the record clearly establishes that she held herself out as a spiritual leader of the school, and that she performed many significant religious functions to advance its religious mission. She was thus a "minister" for purposes of the exception.

## BACKGROUND

Fratello was employed by St. Anthony's School (the "School"), a Roman Catholic elementary school located in Nanuet, New York. She served as the School's principal from 2007 until 2011, when the School declined to renew her contract. She claims employment discrimination by the School, St. Anthony's Shrine Church (the "Church"), and the Archdiocese of New York (the "Archdiocese"), alleging that her employment was terminated on the basis of gender discrimination and in retaliation for her reporting the alleged discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and New York State Executive Law § 296. The defendants argue as an affirmative defense that the ministerial exception bars these claims.

*A. Mission of Archdiocese Schools*

The Archdiocese is a constituent entity of the Roman Catholic Church covering ten counties in southern New York.[1]  It is led by an Archbishop, currently Timothy Cardinal Dolan.  According to the Administrative Manual for its schools (the "Manual"), the Archdiocese has for more than two centuries provided elementary schools for "ethnically and economically diverse student population[s] in urban and suburban settings."  Manual, Chapter I: Goals, *Mission and Aim of Catholic Education in the Archdiocese*, at App'x at 121.

The Manual sets forth the principles on which the School and others within the Archdiocese are to operate.[2]  According to the Manual, the "foundation and mission" of these schools is "formation in the faith, for the lived experience of Gospel values and for the preservation of Catholic culture."  *Id.*, at App'x at 122.  They seek to train students "to be disciples of Jesus Christ who will

---

[1] Nanuet, New York, where the School is located, is in Rockland County in the northern suburbs of New York City.

[2] Because we give significant weight to the provisions of the Manual, we first caution that its contents establish very little by themselves.  What is significant is that the Manual undisputedly governed the operation of the School, and that those who operated the School regarded the Manual as authoritative and generally sought to conform to the practices and standards that it espoused.

live [by] their faith and provide intelligent, creative, and generous service to the human community." *Id*., at App'x at 121.[3]  The schools are told to advance their mission through, among other things, the "explicit study of the Catholic faith." *Id*., at App'x at 121; *see also id*. ¶ 104, at App'x at 123 ("Gospel teaching . . . is the fundamental element in the educative process . . . .").  Indeed, religion is taught in Archdiocese schools at every grade level, through eighth grade, as a distinct class treated administratively in the same manner as those on other academic subjects.

The Manual states that the Cardinal Archbishop is "[u]ltimate[ly] responsib[le]" for meeting these goals. *Id*. ¶ 200, at App'x at 125.  He "delegates responsibility for representing him in administrative and educational matters to the Secretary for Education and the Superintendent of Schools." *Id*.  Specific local schools are entrusted to the Parish Pastor, who "delegates the immediate direction of the school and its instructional program to the principal." *Id*. ¶ 300, at App'x at 128.

---

[3] The School's website similarly states that its mission "is to provide a high-quality, educational experience that enhances each child's spiritual, emotional, intellectual and social growth.  [Its] faculty and staff prepare [its] students to become future leaders and responsible stewards of God's creation." *About Us*, St. Anthony School, http://www.stanthonyschoolnanuet.org/about-us/ (last visited May 19, 2017).

*B. Principal's Role*

The Manual begins with a cover letter from Edward Cardinal Egan (the late former Archbishop) to principals of Archdiocese schools. It describes "principals in the [Archdiocese] schools" as "having accepted the vocation and challenge of leadership in Catholic education." Cover Letter from Edward Cardinal Egan (Dec. 2006), at App'x at 110. It further states that (1) the "principals . . . are providing splendid leadership to [] teachers and staff and excellent academic and spiritual formation to [] students"; and (2) principals "must fulfill" "administrative tasks . . . providing the structure needed to carry out the vital work of Catholic education . . . infused with the Catholic Faith and values that are so needed by the young people who come to [Archdiocese schools]." *Id*.

The Manual also explicates the principal's job description: "The principal is the Catholic leader and the administrative head of the school [who] is responsible for the effective operation of the school as an educational institution

within the total [P]arish educational program."  Manual ¶ 320, at App'x at 132.[4]

The principal provides "Catholic leadership" by:

> [1] cooperat[ing] with the [P]astor in recruiting and maintaining a staff committed to the goals of a Catholic school; [2] cooperat[ing] with the [P]astor in his religious ministry to the students; [3] ensur[ing] adherence to the curriculum guidelines, *Guidelines for Catechesis*, 1998; [4] monitor[ing] the acquisition of catechetical certification for teachers of religion[;] [5] direct[ing] the implementation of the religious education program[;] . . . [6] commit[ing] to the mission of evangelization[;] [7] involv[ing] the staff in formulating plans that enable the school to meet its religious goals; [8] provid[ing] opportunities for student, faculty, and parent participation in liturgical and paraliturgical services; [9] intitiat[ing] programs that inculcate an attitude and foster the practice of service to others; [10] motivat[ing] the students to take an active part in the life of the [P]arish; [11] promot[ing] in faculty, students, and parents the concept of the school as a community of faith; [12] provid[ing] opportunities for the practice of this concept; [and 13] cooperat[ing] with the [P]arish council by attending council meetings and by keeping the council informed of school matters.

*Id*. ¶ 322, at App'x at 133.  In fulfilling these duties, the principal is to provide

"essential" instruction to new teachers on the "Catholic identity of the school," *id*.

¶ 430, at App'x at 154, and ensure that all teachers understand that "[t]he Church

---

[4] The principal's day-to-day responsibilities include "[p]ersonnel [m]anagement," "[o]ffice [m]anagement," "[p]ublic and [c]ommunity [r]elations," "[b]udget and [f]iscal [m]anagement," "[t]eacher [d]evelopment," and "[e]valuation of [s]tudents."  Manual ¶¶ 324, 326, at App'x at 134-36.  "[T]he principal does not [typically] assume any teaching responsibilities[,]" but may do so "[i]n some instances . . . provided that [it] does not interfere with the principal's responsibility for administering and supervising the total instructional program."  *Id*. ¶ 320, at App'x at 132.

puts its trust in them" to provide "faith education" and help students "integrat[e] . . . the Gospel" into daily life, *id*. ¶ 106, at App'x at 123.

The Manual further instructs that the principal should implement the "Catholic Values Infusion Program[,] . . . a very conscious and collaborative way for the principal to fulfill the mission of transmitting Catholic values, culture and traditions to each succeeding generation, to fulfill the essential purpose of a Catholic school and to assist faculties to do the same."  *Id*. ¶ 326, at App'x at 136. Under this program, the principal serves as: (1) a "[s]piritual [l]eader" who "bear[s] the responsibility of integrating Gospel values into the vision, goals, policies and practices, life, and curriculum of the school," Catholic Education Community: A Values Integration Program ("Values Integration Program") at 12, at Supp. App'x at 56; (2) a "[t]radition [b]earer" who "model[s] the Catholic values [that are] central to the spirit of the Catholic school," *id*. at 13, at Supp. App'x at 57; and (3) the "prime communicator of the message" who "promote[s] the values of the Catholic school," *id*. at 14, at Supp. App'x at 58.[5]

---

[5] According to Fratello, though, the School did not seek to proselytize or indoctrinate non-Catholic students.  *See* Fratello Decl. ¶¶ 24-25, at App'x at 294.  Assuming that to be so, it is not material to our decision here.

Applicants for principal positions must meet several religious qualifications. First, they must be "practicing Catholic[s] in union with Rome, with a commitment to the teachings of the Church and to the development of Christian spirit and a community of faith within a school." Manual ¶ 328, at App'x at 138. Second, applicants should "[c]omplet[e] . . . Levels I and II of the Catechist Certification Program" at least "by the [end] of their fourth year of service." *Id.*, at App'x at 138.[6] Third, they "must demonstrate proficiency" in a number of religious areas: "[e]mbody[ing] Christ-centered principles," "[e]ncourag[ing] the spiritual growth . . . of each and every student," "[e]xercis[ing] spiritual leadership to ensure a thriving Catholic school community," and "promot[ing] Catholic education." Official Job Summary and Qualifications for Archdiocese School Principal ("Job Summary and Qualifications"), at App'x at 243.

---

[6] Fratello asserts that the certification requirement is "aspirational" and "not strictly enforced" by the Archdiocese. Pl.'s Resp. & Counterstatement to Defs.' Rule 56.1 Statement ¶ 18, at App'x at 307. She also asserts that, although she is Catholic, her "academic credentials are in education, and she has no formal training in religion or theology." Pl.'s Rule 56.1 Statement in Support of Cross-Motion to Strike Ministerial Immunity Defense ¶ 4, at App'x at 344. We, like the district court, "assume . . . that [the] certification requirement was not strictly enforced," at least with respect to Fratello. *Fratello v. Roman Catholic Archdiocese of N.Y.*, 175 F. Supp. 3d 152, 166 (S.D.N.Y. 2016).

*C. Fratello as Principal*

In March 2007, Fratello applied to be the School's principal with a letter drawing attention to her then-job as "a Principal . . . at St. Joseph School" (another school in the Archdiocese) and her "strong Catholic faith." Letter from Fratello to the School (Mar. 23, 2007), at App'x at 191. She provided her references a recommendation form indicating that she was applying for an "important leadership role" within the Archdiocese. Reference Request (July 10, 2006), at App'x at 190.

In 2007, Fratello was interviewed by the Archdiocese's Principal Search Committee (the "Committee"), Decl. of Cathleen Cassel[7] ("Cassel Decl.") ¶¶ 5-13, at Supp. App'x at 29-31, which

> strived to hire Principals with strong Christian values, dedicated [to] providing teachers and students with instruction in religious truth and value, maintaining a set of educational policies [that] are in conformity with the religious beliefs and moral standards of the Archdiocese[,] and further fostering an educational environment [that] teaches students how to live in accordance with the teachings of Jesus.

*Id*. ¶ 10, at Supp. App'x at 30.[8]

---

[7] Cassel was at the relevant time "a member of the . . . Committee," and is now "the Regional Superintendent for Rockland County for the [Archdiocese]." Cassel Decl. ¶¶ 1, 5, at Supp. App'x at 28-29.

Later that year, Fratello was hired and signed a one-year "Contract of Employment for Lay Principals" (the "Lay Contract") with the School, subject to annual renewal. It provided, among other things, that "[t]he principal recognizes the religious nature of the Catholic school[,] and . . . the [School] retains the right to dismiss [the] principal for immorality, scandal, disregard or disobedience of the [Archdiocese's] polices or rules . . . , or rejection of the official teaching, doctrine or laws of the Roman Catholic Church." Lay Contract ¶ 3(d), at App'x at 85.

*1. Religious Job Functions*

Shortly after becoming principal, Fratello implemented a new prayer system within the School. Every school-day morning, Fratello hosted an eighth-grade student to pray over a loudspeaker system heard in all the classrooms, and at the end of the prayer, she proclaimed, "Praise to you Lord Jesus Christ."

---

[8] When interviewing principal candidates, the Committee generally asked some form of the following questions: (1) "What is your personal relationship with the church?" (2) "Why do you want to be Principal of [a] Catholic School (as opposed to a secular private school)?" (3) "What is your relationship with the Pastor and the parents at the current school you work in?" (4) "What do you think is a good religion lesson?" (5) "What would you do at the school to implement communal prayer?" Cassel Decl. ¶ 11, at Supp. App'x at 30.

Declaration of AnnMarie Weber[9] ("Weber Decl.") ¶ 8, at Supp. App'x at 82. The student then read another prayer and concluded by reciting the "Our Father" prayer (or the "Lord's Prayer"). *Id.*[10]

Fratello also communicated religious messages over the School's loudspeaker system during various holiday seasons. On Fridays in October, Fratello celebrated the Feast of Our Lady of the Rosary by reciting over the loudspeaker the "Our Father" prayer, ten "Hail Mary" prayers,[11] and one "Glory

---

[9] Weber was "employed as the Administrative Assistant to the Principal of [the School] . . . throughout [Fratello's] entire tenure with the School," and remains employed in that position. Weber Decl. ¶ 1, at Supp. App'x at 80.

[10] One articulation of the prayer:

> Our Father, Who art in Heaven, hallowed be Thy name; Thy Kingdom come, Thy will be done on earth as it is in Heaven. Give us this day our daily bread; and forgive us our trespasses as we forgive those who trespass against us; and lead us not into temptation, but deliver us from evil. Amen.

Weber Decl. ¶ 8, at Supp. App'x at 82.

[11] One articulation: "Hail Mary, full of grace, the Lord is with thee; Blessed art thou among women, and blessed is the fruit of thy womb, Jesus. Holy Mary, Mother of God, pray for us sinners, now and at the hour of death. Amen." Weber Decl. ¶ 11, at Supp. App'x at 83.

Be" prayer.[12] *Id.* ¶ 11, at Supp. App'x at 83. "[O]n most school days in December during the Advent season," she "read [over the loudspeaker system] the story of the 'Jesse Tree'" to "help[] students connect the custom of decorating Christmas trees to the events leading to Jesus' birth," and to illustrate "the faithfulness of God." Declaration of Sister Lynn Ann Lewis[13] ("Sister Lewis Decl.") ¶ 13, at App'x at 97-98.

Fratello also played a significant role in planning and executing religious assemblies for students. She supervised and approved the selection of hymns, decorations, and lay persons to recite prayers at annual special Masses held in November and May. And at the end of each school year, she delivered a religious message from the church pulpit to the graduating eighth-grade class and prayed for God's blessing on them.

In a yearbook message, Fratello congratulated students on their spiritual growth and adherence to Catholic teaching. She also drafted a monthly newsletter that, among other things, invited School families to join her at Mass,

---

[12] One articulation: "Glory Be to the Father, and to the Son, and to the Holy Spirit. As it was in the beginning, is now, and ever shall be, world without end. Amen." Weber Decl. ¶ 11, at Supp. App'x at 83.

[13] Sister Lewis is a Dominican Sister who has been a first-grade teacher at the School since 1970. Sister Lewis Decl. ¶¶ 1, 4, at App'x at 95-96.

expressed her enthusiasm for students' receptiveness to the Catholic faith, and encouraged students' extracurricular spiritual growth. Although she did not herself act as a teacher, she frequently supervised teachers in their instruction of the Catholic faith and directed the content of the religious curriculum, including the selection of all instructional materials and textbooks.

*2. Evaluations*

In Spring 2008, at the end of her first term as principal, Fratello's performance was evaluated by "the Superintendent, the Pastor of the Church and the teachers based on the Principal's ability to perform as (i) a Religious Leader; (ii) an Instructional Leader; (iii) a Communicator; and (iv) [an] Administrator." Declaration of Mary Jane Daley[14] ("Daley Decl.") ¶ 21, at App'x at 106.

The Pastor's evaluation assessed, among other things, whether Fratello: (1) "foster[ed] a Christian atmosphere which enable[d] staff and students to achieve their potential"; (2) "g[a]ve[] priority to a comprehensive religious education program by [] implementing Archdiocesan guidelines[,] encouraging communal worship,"  and "supporting service-oriented activities"; (3) "ensure[d]

---

[14] Daley has been "the Regional Superintendent" since 2008, and was previously an Archdiocese school principal.  Daley Decl. ¶ 1, at App'x at 100.

that religion classes [were] taught by knowledgeable and committed Catholics";

(4) "encourage[d] teachers to obtain Archdiocesan catechetical certification";

(5) "provide[d] for religious growth among staff members"; (6) "ensure[d] the

implementation of the Catholic Values Integration Program in curriculum and all

other aspects of school life"; (7) "uph[e]ld[] and strengthen[ed] the [School's]

Catholic identity"; (8) "encourage[d] and support[ed] a strong program of

evangelization"; and (9) "provide[d] a variety of opportunities for faculty to meet

as a Christian community."  Pastor's Evaluation of Principal (the "Pastor

Evaluation") at 1-2, at App'x at 198-99.  Fratello received high marks in many of

these categories. *Id*.

Fratello's other evaluators commended her for "renewing the Catholic

[i]dentity of St. Anthony's School Office"; "setting a good example as a religion

leader"; bringing "a renewed sense of Christian [s]pirituality"; "creating an

atmosphere rich with a sense of Catholic Community"; and "making religious

values, attitude and behavior the focus of life at the School."  Daley Decl. ¶ 25, at

App'x at 107.  The School's faculty members gave her high marks as a "Religious

Leader." *See, e.g.*, Mary Ann Driscoll's Faculty Evaluation of Principal (the

"Driscoll Evaluation") at 1, at App'x at 113; Sister Lynne A. Lewis's Faculty

Evaluation of Principal (the "Sister Lewis Evaluation") at 1, at App'x 119; Sister Daniel Catherine Connolly's Faculty Evaluation of Principal (the "Sister Connolly Evaluation") at 1, at App'x 133; Carol McGuirk's Faculty Evaluation of Principal (the "McGuirk Evaluation") at 1, at App'x at 143; Karen Ladolcetta's Faculty Evaluation of Principal (the "Ladolcetta Evaluation") at 1, at App'x at 157; Margaret Murphy's Faculty Evaluation of Principal (the "Murphy Evaluation") at 1, at App'x at 189.

Following these evaluations, Fratello's employment was renewed for a three-year term. At the conclusion of that term in Spring 2011, however, the School declined to renew her contract.[15]

---

[15] Because of the procedural status of the case, the defendants' position as to why they did not renew Fratello's contract is not entirely clear. *See* Appellee's Br. at 18 n.3 (noting that "[f]or purposes of this appeal, the Court must take [Fratello's gender-discrimination and retaliation allegations] to be true," and asserting that "although it is irrelevant to the question before the Court" regarding the ministerial exception, Fratello's employment was terminated because she "engaged in insubordination towards the [P]astor of St. Anthony's"). If, as the district court concluded, the ministerial exception applies, the reason for her termination does not matter. Had a religious reason been proffered, however, our precedent suggests that a foray into the ministerial exception would perhaps not be necessary. *See infra* note 25.

*D. Procedural History*

Fratello filed a complaint in the United States District Court for the Southern District of New York seeking reinstatement and damages on the ground that the defendants terminated her employment on the basis of gender discrimination and retaliation, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and New York State Executive Law § 296. After finding that it could not determine whether the ministerial exception applied to Fratello's claims on a motion to dismiss, the district court appropriately ordered discovery limited to whether Fratello was a minister within the meaning of the exception. At the close of that limited discovery, the parties filed cross-motions for summary judgment: The defendants sought summary judgment on all of Fratello's claims based on the ministerial exception, an affirmative defense; Fratello sought summary judgment striking that defense on the ground that she was not a minister within the meaning of the exception. The district court granted the defendants' motion and awarded them summary judgment by opinion and order dated March 29,

2016. *Fratello v. Roman Catholic Archdiocese of N.Y.*, 175 F. Supp. 3d 152, 168 (S.D.N.Y. 2016).[16]  This appeal followed.

**DISCUSSION**

The sole question on appeal is whether Fratello's employment-discrimination claims are barred by the ministerial exception in light of the Supreme Court's unanimous decision in *Hosanna-Tabor*, which addressed the subject.  We conclude that they are.

**I.    Standard of Review**

We review a district court's award of summary judgment *de novo*, "constru[ing] the evidence in the light most favorable to the [losing party]" and "drawing all reasonable inferences and resolving all ambiguities in [its] favor." *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017) (internal quotation marks omitted).  "We affirm . . . only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)).

---

[16] The district court declined to exercise supplemental jurisdiction over Fratello's remaining state-law claims.  *See Fratello*, 175 F. Supp. 3d at 168.

**II.    The Ministerial Exception**

The ministerial exception bars employment-discrimination claims brought by ministers against the religious groups that employ or formerly employed them.  *See Hosanna-Tabor*, 565 U.S. at 196 ("When a minister who has been fired sues her church alleging that her termination was discriminatory, . . . [t]he church must be free to choose those who will guide it on its way.").  This doctrine addresses a tension between two core values underlying much of our constitutional doctrine and federal law: equal protection and religious liberty.  Laws that prohibit various kinds of employment discrimination are intended to give effect to the equality principle.  As such, they are, as the Chief Justice writing for the *Hosanna-Tabor* Court stated, "undoubtedly important" to "society."  *Id*.

The First Amendment's religion clauses are also of fundamental importance.  Amongst other things, they have since their inception been understood to ensure the separation of church and state.[17]  *See* U.S. CONST.

---

[17] Acknowledging that there are many "[c]ompeting" conceptions of the phrase "separation of church and state," we use it here only "as a shorthand for vague notions of religious liberty as guaranteed in the First Amendment."  Douglas Laycock, *The Many Meanings of Separation*, 70 U. CHI. L. REV. 1667, 1687 (2003).

amend. I (prohibiting any "law respecting an establishment of religion, or prohibiting the free exercise thereof").

In the context of employment disputes, these two core values sometimes conflict, and a balance must be struck. *Hosanna-Tabor* instructs that where a defendant is able to establish that the ministerial exception applies, *see Hosanna-Tabor*, 565 U.S. at 195 n.4 (explaining that the ministerial exception is an affirmative defense), the "First Amendment has struck the balance for us" in favor of religious liberty, *id.* at 196.

*A. Historical Underpinnings*[18]

As the Chief Justice explained on behalf of the Court in *Hosanna-Tabor*, the ministerial exception's historical roots extend to the founding generation, which adopted the First Amendment "against th[e] background" of "life under the established Church of England." *Id.* at 183. Under English law, "the monarch [was] the supreme head of the Church of England" with authority over its clergy, and the Parliament "set forth the doctrinal tenets of the Church" and "prescribed the liturgy for religious worship." Michael W. McConnell, *Establishment and*

---

[18] As will become apparent, many of the following historical observations reflect those that the Chief Justice made for the Supreme Court in *Hosanna-Tabor*, 565 U.S. at 182-87.

*Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2112-13 (2003).  Significantly, "ministers [were required] to conform to these requirements, making the Church of England the sole institution for lawful public worship."  *Id*. at 2113.

"Seeking to escape the control of the national church, the Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship."  *Hosanna-Tabor*, 565 U.S. at 182.  Quakers "sought independence" in Pennsylvania and Delaware.  *Id*. at 183.  Even Southern colonists, who "brought the Church of England with them[,] . . . sometimes chafed at the control exercised by the Crown," particularly when "[c]ontroversies over the selection of ministers . . . arose in . . . Colonies with Anglican establishments," such as Virginia and North Carolina.  *Id*.

As the Chief Justice explained in *Hosanna-Tabor*, by adopting the First Amendment, "the founding generation sought to foreclose the possibility of a national church."  *Id*.[19]  To that end, the "Religion Clauses ensured that the new

---

[19] Disestablishment at the state level was not, however, initially apparent.  "Most of [the thirteen original] colonies had an established church," each a specific Protestant denomination, "sponsored and supported by the colonial government":  "The Church of England was established in five southern colonies and in parts of New York," and "[i]n

Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices. The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id*. at 184.

"[I]t was some time," though, before courts were required to address the tension between anti-discrimination laws and "a church's ability to select its own ministers." *Id*. at 185.[20] Following "the passage of Title VII . . . and other

---

three New England colonies, the established church was chosen by local elections, . . . nearly always won by [Puritan denominations]." Douglas Laycock, *Church and State in the United States: Competing Conceptions and Historic Changes*, 13 IND. J. GLOBAL LEGAL STUD. 503, 507 (2006). Over time, though, "[t]he dominant regional position of [the Anglicans and Puritans] was threatened by continued immigration of" members of other Protestant denominations—particularly Baptists, Presbyterians, and other "ancestors of the [contemporary] evangelical movement"—that "dissented from the teachings of the established church[es]." *Id*. at 508. As these dissenting groups grew, they "insisted" on constitutional guarantees prohibiting established religion. *Id*. They eventually succeeded, and "[b]y 1834, no state in the Union would have an established church, and the tradition of separation between church and state would seem an ingrained and vital part of our constitutional system." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1437 (1990); *see also id*. at 1437-43 (describing in detail the "evangelical movement" that "dr[o]ve" disestablishment in the states).

[20] Although before *Hosanna-Tabor* the Supreme Court had never explicitly recognized a ministerial exception, it had, as the *Hosanna-Tabor* Court pointed out, "touched upon the issue indirectly . . . in the context of disputes over church property" in a series of cases that "confirm[ed] that it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Hosanna-Tabor*, 565 U.S. at 185; *see also Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1872) (explaining that "whenever the

24

employment discrimination laws," *id*. at 188, however, "courts began to develop the constitutional doctrine we now call the ministerial exception," Christopher C. Lund, *In Defense of the Ministerial Exception*, 90 N.C. L. REV. 1, 20-21 (2011) (reviewing earlier cases). More than forty years ago, the Fifth Circuit held that the First Amendment requires that a ministerial exception be applied to Title VII claims.[21] *See McClure v. Salvation Army*, 460 F.2d 553, 555 (5th Cir. 1972), *cert. denied*, 409 U.S. 896 (1972) (reasoning that "[m]atters touching" "[t]he relationship between an organized church and its ministers . . . must necessarily be recognized as of prime ecclesiastical concern" because a church's "minister is the

---

questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the[] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them"); *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (recognizing "a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25 (1976) (holding that, when ecclesiastical tribunals decide disputes related to "their own rules and regulations for internal discipline and government, . . . the Constitution requires that civil courts accept their decisions as binding upon them").

[21] A constitutionally derived ministerial exception is necessary in the context of Title VII because, although that statute exempts religious entities and educational organizations with respect to religious-discrimination claims, *see* 42 U.S.C. § 2000e-1(a), it does not exempt them from claims based on race, gender, or national origin. *See Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

chief instrument by which [it] seeks to fulfill its purpose").  Over the next several decades, we and every other Circuit to address the issue[22] concluded that the First Amendment requires a ministerial exception.  *See Rweyemamu v. Cote*, 520 F.3d 198, 204-09 (2d Cir. 2008).  Then, in *Hosanna-Tabor*, the Supreme Court "agree[d]" with the Courts of Appeals that there is "a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment-discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers."  *Hosanna-Tabor*, 565 U.S. at 188.

As the Court explained, because "[t]he members of a religious group put their faith in the hands of their ministers," it would "intrude[] upon more than a mere employment decision" to "[r]equir[e] a church to accept or retain an unwanted minister, or [to] punish[] a church for failing to do so."  *Id*.  Either

[22] *See, e.g.*, *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989); *Petruska v. Gannon Univ.*, 462 F.3d 294, 303-07 (3d. Cir. 2006), *cert. denied*, 550 U.S. 2098 (2007); *EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 800-01 (4th Cir. 2000); *Combs v. Cent. Tex. Annual Conference*, 173 F.3d 343, 345-50 (5th Cir. 1999); *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225-27 (6th Cir. 2007), *cert. denied*, 552 U.S. 857 (2007); *Schleicher v. Salvation Army*, 518 F.3d 472, 475-76 (7th Cir. 2008); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362-63 (8th Cir. 1991); *Werft v. Desert Sw. Annual Conference*, 377 F.3d 1099, 1100-04 (9th Cir. 2004) (per curiam); *Bryce v. Episcopal Church*, 289 F.3d 648, 655-57 (10th Cir. 2002); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1301-04 (11th Cir. 2000); *EEOC v. Catholic Univ.*, 83 F.3d 455, 460-63 (D.C. Cir. 1996).

action would "interefere[] with the internal governance of the church, depriving [it] of control over selection of those who will personify its beliefs,"[23] in violation of both religion clauses:  "By imposing an unwanted minister, the state [would] infringe[] the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments," and by "determin[ing] which individuals will minister to the faithful," the state would "also violate[] the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."  *Id*. at 188-89.

---

[23] Any autonomy that religious groups have over their internal affairs is premised on the "voluntary" decisions of individuals to engage in "religious activity."  Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1403 (1981) (noting that "[t]he [Supreme] Court has repeatedly stated that all who join a church do so with the implied consent to [the church's] government, to which they are bound to submit" (internal quotation marks omitted)).  Indeed, "what might be called institutional or church autonomy is ultimately derived from individual rights."  Richard Schragger & Micah Schwartzman, *Against Religious Institutionalism*, 99 VA. L. REV. 917, 920 (2013); *see also id*. at 957-59 (noting that the conception of a "church as a voluntary association" of individual conscience can be traced to the philosopher John Locke (citing John Locke, A LETTER CONCERNING TOLERATION 28 (James H. Tully ed., 1983) (1629))); Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. REV. 346, 378 (2002) ("By the late eighteenth century, some version of Locke's basic view of the nature of liberty of conscience had been formally embraced by nearly every politically active American writing on the subject of religion and the state.").

*B. Effect of* **Hosanna-Tabor**

This is our first occasion to address the scope of the ministerial exception and apply it to a specific case with the benefit of *Hosanna-Tabor*.[24]

Before that decision, as noted above, we "formally adopt[ed] the ministerial exception" in *Rweyemamu*, 520 F.3d at 207. That appeal involved a Catholic priest's Title VII racial-discrimination claim against his former Diocese and Bishop, "[a]lleging that [they] . . . misapplied canon law in denying him a requested promotion and, ultimately, in terminating him." *Id*. at 199. Addressing whether the ministerial exception barred his claims, we explained that the First Amendment required consideration of both the "'function' of an employee, rather than his title or the fact of his ordination," and also "the type of claim asserted." *Id*. at 208. We explained that while "a lay employee's relationship to his employer may be so pervasively religious that judicial interference in the form of a discrimination inquiry could run afoul of the

---

[24] We have indeed addressed *Hosanna-Tabor* once before, but did so principally to distinguish it from an Establishment Clause claim brought against a government agency that barred religious services from being held at government-owned facilities. *See Bronx Household of Faith v. Bd. of Educ.*, 750 F.3d 184, 200-04 (2d Cir. 2014). This is our first opportunity to address the scope of the ministerial exception in light of *Hosanna-Tabor*.

Constitution," *id*. (internal quotation marks omitted),[25] an employee of any rank "in the church hierarchy . . . alleging particular wrongs by the church that are wholly non-religious in nature"—including, for example, certain common-law tort claims—"is surely not forbidden his day in court." *Id*.

We concluded, though, that the particular facts of the case before us did not require us then to "attempt to delineate the boundaries of the ministerial exception" because the plaintiff's "Title VII claim easily f[ell] within them" insofar as he was "an ordained priest of the Roman Catholic Church," whose "duties [were] determined by Catholic doctrine and . . . drawn into question in [the] case" such that "impermissible entanglement with religious doctrine" was unavoidable. *Id*. at 209. Indeed, "in order to prevail on his Title VII claim, he [would have had to] argue that the decision of the [religious authorities] was not only erroneous, but also pretextual." *Id*. We therefore held that his "claim fail[ed] at its inception" "[b]ecause Title VII [was] unconstitutional as applied in th[at] case." *Id*.

---

[25] We further noted that "even when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action." *Rweyemamu*, 520 F.3d at 207.

Our decision in *Rweyemamu* made clear that the question whether an employee was a minister within the meaning of the exception turned principally on the employee's job functions, and that where such employees were found to be ministers, they were barred from bringing Title VII claims against their religious employers when their claims would "inexorably entangle [the court] in doctrinal disputes." *Id*. at 208. But the decision seemed (at least to some district courts in this Circuit) to leave open the possibility that some employment-discrimination claims by ministers might not be barred if excessive entanglement could be avoided in the particular case. *See, e.g.*, *Rojas v. Roman Catholic Diocese of Rochester*, 557 F. Supp. 2d 387, 398 n.8 (W.D.N.Y. 2008) ("interpret[ing] th[e] holding [of *Rweyemamu*] to mean that, in this Circuit, the ministerial exception does not necessarily apply to claims involving the hiring or firing of a minister, unless the hiring or firing involves issues of a religion"); *Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125, 132 (E.D.N.Y. 2008) (concluding in light of *Rweyemamu* that "an examination not just of [the] plaintiff's function [was] required, but also of the nature of [her Title VII] claim" to determine whether "the dispute in this case is such that its resolution inevitably will . . . impermissibly entangl[e] the court in matters of religious doctrine").

In *Hosanna-Tabor*, however, the Supreme Court made clear that those properly characterized as "ministers" are flatly barred from bringing employment-discrimination claims against the religious groups that employ or formerly employed them. *See Hosanna-Tabor*, 565 U.S. at 194. As the Supreme Court explained, the ministerial exception's purpose "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason," but to "ensure[] that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Id*. at 194-95 (internal quotation marks and citation omitted).

Armed only with the law as written and the tools of judicial reasoning, courts are ill-equipped to assess whether, and to what extent, an employment dispute between a minister and his or her religious group is premised on religious grounds. S*ee* Paul Horwitz, *Act III of the Ministerial Exception*, 106 NW. U. L. REV. 973, 979 (2012) (asserting that *Hosanna-Tabor* "confirmed" the principle that "judges cannot evaluate the kinds of religious questions that come up in employment discrimination cases involving ministerial employees" because they "are simply incompetent to address them"). Judges are not well positioned to determine whether ministerial employment decisions rest on practical and

secular considerations or fundamentally different ones that may lead to results that, though perhaps difficult for a person not intimately familiar with the religion to understand, are perfectly sensible—and perhaps even necessary—in the eyes of the faithful.  In the Abrahamic religious traditions, for instance, a stammering Moses was chosen to lead the people, and a scrawny David to slay a giant.[26]

The notion of judicial incompetence with respect to strictly ecclesiastical matters can be traced at least as far back as James Madison, "the leading architect of the religious clauses of the First Amendment." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011) (quoting *Flast v. Cohen*, 392 U.S. 83, 103 (1968)). He argued against a proposed tax bill in Virginia to aid Christian religious teachers because, among other things, the proposed legislation:

> implie[d] either that the Civil Magistrate is a competent Judge of Religious truth; or that he may employ Religion as an engine of Civil

---

[26] These examples, used for illustrative purposes, are obviously arbitrary and simplistic.  Maybe, for example, there were good practical reasons for those choices.  But this is neither the time nor the place to comment on them further.  That is the point:  This is not the time, because a court is virtually never the place, to analyze the grounds for a religious group's reasons for selecting its ministers. *See Hosanna-Tabor*, 565 U.S. at 194-95.  We say "virtually never" because we are unable, with necessarily limited knowledge, to exclude entirely the possibility that there are situations in which courts may be called upon to consider such questions.

policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world[;] [t]he second an unhallowed perversion of the means of salvation.

*Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 722 (1970) (Douglas, J., dissenting)

(quoting James Madison, *Memorial and Remonstrance Against Religious*

*Assessments*, 2 THE WRITINGS OF JAMES MADISON 183-91 (G. Hunt ed., 1901)); *see*

*also Ariz. Christian Sch. Tuition Org.*, 563 U.S. at 162-68 (Kagan, J., dissenting)

(providing historical context for Madison's argument).

In light of these concerns, the Supreme Court in *Hosanna-Tabor* made clear that the First Amendment does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action. *See Hosanna-Tabor*, 565 U.S. at 194 (explaining that with respect to ministers, the First Amendment bars an order of reinstatement, which would "require[] the Church to accept a minister it did not want," and damages, which "would operate as a penalty on the Church for terminating an unwanted minister").

Therefore, whether the ministerial exception bars employment-discrimination claims against a religious organization depends entirely on

whether the employee qualifies as a "minister" within the meaning of the exception. *See id*. at 190-91.[27] But that is hardly a question that admits of an easy or mechanical method for deriving an answer.

Indeed, the Supreme Court's opinion in *Hosanna-Tabor*—unanimous with two concurring opinions subscribed to by three Justices—is not without its Delphic qualities. The Chief Justice explained that the Court was "reluctant . . . to adopt a rigid formula for deciding when an employee qualifies as a minister. It [was] enough for [it] to conclude, in [its] first case involving the ministerial exception, that the exception covers [the teacher-plaintiff in that case], given all

---

[27] There may in some instances be a threshold question as to whether the employer is a religious group within the meaning of the ministerial exception. *See, e.g., Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833-34 (6th Cir. 2015) (concluding that a Christian organization could "assert the ministerial exception" because, though not a church, it was nonetheless a "religious group" insofar as it sought "to advance the understanding and practice of Christianity in colleges and universities"). We are not, for example, called upon today—as we have been in the past—to decide whether a chapter of Alcoholics Anonymous ("A.A.") is a religious group for these or similar purposes. *Cf. DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 406 (2d Cir. 2001) (noting that we had previously "held that a county government agency violated the Establishment Clause when it conditioned the plaintiff's criminal probation on his participation in A.A." (citing *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1075-76 (2d Cir. 1997), *reaff'd after remand*, 173 F.3d 120 (2d Cir. 1999), *cert. denied*, 528 U.S. 1003 (1999))); *see also id*. at 407 (citing *Griffin v. Coughlin*, 673 N.E.2d 98, 103, 88 N.Y.2d 674, 683, 649 N.Y.S.2d 903, 908 (1996), *cert. denied*, 519 U.S. 1054 (1997) (holding that the A.A. materials in the record "demonstrate[d] beyond peradventure that doctrinally and as actually practiced in the 12-step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization")).

the circumstances of her employment." *Id.* at 190. The Court then identified various factors it considered in making that judgment with respect to a former fourth-grade teacher of a church-run Missouri Synod Lutheran school: "In light of these considerations—[1] the formal title given [to the teacher-plaintiff] by the Church, [2] the substance reflected in that title, [3] her own use of that title, and [4] the important religious functions she performed for the Church—we conclude that [she] was a minister covered by the ministerial exception." *Id.* at 192.[28] Thus, *Hosanna-Tabor* instructs only as to what we *might* take into account as relevant, including the four considerations on which it relied; it neither limits the inquiry to those considerations nor requires their application in every case.

We thus set forth on our journey with only limited direction from the Supreme Court's controlling opinion in *Hosanna-Tabor*. But in finding our way, as will appear, we receive and accept substantial further guidance from the concurrence of Justice Alito, in which Justice Kagan joined. *See id.* at 198-206 (Alito, J., concurring). We refer to it frequently below not because we are bound

---

[28] The Supreme Court in *Hosanna-Tabor* concluded that: (1) the plaintiff's formal title was "Minister of Religion, Commissioned"; (2) that title "reflected a significant degree of religious training followed by a formal process of commissioning"; (3) she "held herself out as a minister of the Church by accepting the formal call to religious service"; and (4) "[her] job duties reflected a role conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 191-92.

to follow it—of course we are not—but because we find its analysis both persuasive and extremely helpful.

Justice Alito pointed out that a formal title indicating that the plaintiff is playing a religious role, though often relevant, "is neither necessary nor sufficient," *id*. at 202 (Alito, J., concurring), and that "courts should focus on the function performed by persons who work for religious bodies," *id*. at 198 (Alito, J., concurring). Although each of the four considerations cited in the Chief Justice's opinion were in that case relevant, Justice Alito explained, "it would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in" ministerial-exception cases. *Id*. (Alito, J., concurring); *see also Rweyemamu*, 520 F.3d at 206 ("not[ing] that the term 'ministerial exception' is judicial shorthand . . . [that] is imprecise" because the exception covers "more than just 'ministers'"). "[M]ost faiths do not employ the term 'minister,' and some eschew the concept of formal ordination"; other "faiths consider the ministry to consist of all or a very large percentage of their members." *Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., concurring).

We agree. Where, as here, the four considerations are relevant in a particular case, "courts should focus" primarily "on the function[s] performed by persons who work for religious bodies." *Id*. at 198 (Alito, J., concurring); *see also Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177 (5th Cir. 2012) (applying the ministerial exception to a church music director, noting that "it [was] enough . . . that . . . [he] played an integral role in the celebration of Mass and that by playing the piano during services, [he] furthered the mission of the church and helped convey its message"); *Temple Emanuel of Newton v. Mass. Comm'n Against Discrim.*, 975 N.E.2d 433, 443, 463 Mass. 472, 486 (2012) (applying the ministerial exception to a teacher at a Jewish school because "she taught religious subjects at a school that functioned solely as a religious school," even though "she was not a rabbi, was not called a rabbi, . . . did not hold herself out as a rabbi," and the record did not disclose whether she had received "religious training").[29] It is the relationship between the activities the employee performs for her employer, and

---

[29] Fratello proposes a novel two-prong test under which an employee is a minister only if (1) "the parties mutually bargained for" a position filled by "a credentialed minister" rather than simply a bona fide occupational qualification; and (2) the religious organization's adverse action is related to its internal governance or religious beliefs. Appellant's Br. at 3-4. We reject this test because it finds no basis in law. Indeed, in some respects it directly contravenes *Hosanna-Tabor*; the second prong of Fratello's test, for example, would require us to consider the nature of the employment dispute, an inquiry foreclosed by *Hosanna-Tabor*, 565 U.S. at 194-95.

the religious activities that the employer espouses and practices, that determines whether employment-discrimination laws implicate the religious group's First Amendment rights by interfering with its freedom to exercise its religion, or establishing in that religion's stead other beliefs or practices.[30]

### III.    Application

Applying these principles here, we conclude that the ministerial exception bars Fratello's employment-discrimination claims against the Archdiocese, the Church, and the School, all of which are religious groups within the meaning of the ministerial exception.  Although her formal title—"lay principal"—does not connote a religious role, the record makes clear that she served many religious functions to advance the School's Roman Catholic mission.

In so concluding, though, we do not accept the defendants' argument that all parochial-school principals should be presumed to be ministers within the

---

[30] As Justice Alito explained,

> The First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the conducting of worship services and other religious ceremonies and rituals, as well as the critical process of communicating the faith.  Accordingly, religious groups must be free to choose the personnel who are essential to the performance of these functions.

*Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring).

meaning of the exception. We think that any such categorical presumption runs counter to the teaching of *Hosanna-Tabor*, in which the Supreme Court looked to the specific circumstances of the plaintiff's employment to determine whether she was a minister. *See Hosanna-Tabor*, 565 U.S. at 190-92 (refusing "to adopt a rigid formula" and considering "all the circumstances" of the plaintiff's employment). Although parochial-school principals may typically qualify as "ministers" within the meaning of the exception, *see, e.g.*, *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1205, 301 Conn. 759, 779 (2011) (determining that "the plaintiff's duties as a Catholic school principal render her a ministerial employee"), some may perform few such religious functions—some, perhaps, none at all. In each case, therefore, we must assess the specific circumstances of employment. We do so here in light of the four considerations articulated in *Hosanna-Tabor*, 565 U.S. at 192, on which the district court relied, *see Fratello*, 175 F. Supp. 3d at 165-68, because they are adequate to resolve the particular circumstances of this case.

### A. Formal Title

We first conclude that the employee's "formal title," *Hosanna-Tabor*, 565 U.S. at 192, weighs against application of the ministerial exception because

Fratello's title, "lay principal,"[31] does not suggest that she was in effect a member of the clergy or that she performed religious functions on behalf of the School. The teacher-plaintiff in *Hosanna-Tabor*, by contrast, was a "called" teacher, as distinct from a "lay" teacher. *Id*. at 177 (explaining that "[t]he Synod classifie[d] teachers into two categories: 'called' and 'lay'"); *see also id*. at 191 (noting that the teacher-plaintiff's formal title was "Minister of Religion, Commissioned").

Fratello would end the analysis here. She contends that the use of the title "lay principal"—rather than "religious principal"—reflects a clear distinction between laity and clergy that precludes application of the ministerial exception.[32]

---

[31] We derive the title "lay principal" from Fratello's employment contract, which was entitled "Contract of Employment for Lay Principals." Lay Contract, at App'x at 84. Beyond that contract's title, however, there is little evidence that she was called "lay principal" rather than just "principal." The body of her employment contract simply uses the term "principal," *see id*. ¶¶ 2-4, at App'x at 84-85, and the Manual does not appear to distinguish between lay principals and religious principals, *see e.g.*, Manual ¶¶ 320, 322, 324, 326 (referring simply to "principal"), at App'x at 135-37. Nor do we understand that the teachers or students referred to her as "lay principal" as opposed to the "principal." Nonetheless, we assume here that her formal title was "lay principal."

[32] The record does reflect certain distinctions between a person identified as a "lay" principal and one identified as a "religious" principal. *Compare* Ministerial Agreement for Religious in the Archdiocese, at App'x 166-68, *with* Lay Contract, App'x at 169-70. The defendants assert that this distinction has nothing to do with a principal's job functions, but merely reflects a difference in the recruitment pool from which particular principals are selected: A "religious principal" is so titled because the individual is a member of a religious order (a nun, for example) who serves the school by agreement of her order, whereas a "lay principal" is not a member of a religious order. True or not,

In other words, she seems to suggest that the formal use of the term "lay" eclipses any religious functions she may have performed in her position. This argument fails for at least two reasons.

First, "a title," though "surely relevant," is not "by itself" dispositive. *Id*. at 193; *see also id*. at 202 (Alito, J., concurring) (noting that "a [religious] title is neither necessary nor sufficient"); *Rweyemamu*, 520 F.3d at 206-07 (noting that the ministerial exception has been applied to a press secretary, Jewish nursing-home staff, and a music director). We cannot accept the notion that by doing no more than changing the title of an employee, a religious-group employer can change its employee's rights under the federal employment-discrimination laws. It cannot insulate itself from that sort of liability by bestowing hollow ministerial titles upon many or all of its employees. Nor would plainly secular titles (by themselves) prevent application of the ministerial exception. We think the substance of the employees' responsibilities in their positions is far more important.

---

this does not alter our conclusion that Fratello's formal title, "lay principal," weighs against ministerial status. That weight, though, is limited.

41

Second, adopting Fratello's approach would in effect penalize religious groups for allowing laypersons to participate in their ministries and thus create an incentive for religious organizations to bar laity from substantial "role[s] in conveying the [organization's] message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. And it would in effect give preference to religious groups that have formal ordination processes over those that do not. *See id*. at 198, 202 & n.3 (Alito, J., concurring) (noting that "the concept of ordination as understood by most Christian churches and by Judaism has no clear counterpart in some Christian denominations and some other religions," such as Islam, in which "there is no class or profession of ordained clergy" because "every Muslim can perform the religious rites" (internal quotation marks omitted)); *see also Larsen v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

Thus, contrary to Fratello's contention, we are confident that our analysis does not end because the formal title "lay principal" does not connote that she was a minister.

*B. Substance Reflected in the Title*

We also consider in this case "the substance reflected in th[e formal] title." *Hosanna-Tabor*, 565 U.S. at 192. Although a close question, we think this consideration cuts in favor of applying the ministerial exception here.

On the one hand, candidates applying for a "lay principal" position at the School are not required to meet any religious-education requirements. Indeed, Fratello's academic credentials are in education, and she has no formal training in religion or theology. *Cf. id.* at 191 (explaining that that the teacher-plaintiff's commission as a "Minister of Religion" required "eight college-level courses in [religious] subjects" and "election by the congregation, which recognized God's call to her to teach").

On the other hand, the record reflects that the School's principal must be a "practicing Catholic in union with Rome, with a commitment to the teachings of the Church and to the development of [a] Christian spirit and a community of faith within [the] school." Manual ¶ 328, at App'x at 138. He or she should, at least in theory,[33] "[c]omplet[e] . . . Levels I and II of the Catechist Certification

---

[33] As noted above, we assume that the certification requirement was not enforced with respect to Fratello.

Program . . . by the [end] of [his or her] fourth year of service." *Id*. The principal must also "[d]emonstrate proficiency" in a number of religious areas: "[e]mbody[ing] Christ-centered principles," "[e]ncourag[ing] the spiritual growth . . . of each and every student," "[e]xercis[ing] spiritual leadership to ensure a thriving Catholic school community," and exhibiting a "[w]illingness to promote Catholic education." Job Summary and Qualifications, at App'x at 243. These requirements help ensure that the principal is able to provide "Catholic [l]eadership" to the School's faculty, students, and community. Manual ¶ 322, at App'x at 133.

Thus, although according to the record a "lay principal" is not strictly required to meet any formal religious-education requirements, the substance reflected in that title as used by the defendants and conveyed to the plaintiff entails proficiency in religious leadership, which we think is evidence in favor of applying the ministerial exception here.

### C. *Fratello's Use of the Title*

We also think that the employee's "use of th[e] title" principal ("lay" or otherwise), *Hosanna-Tabor*, 565 U.S. at 192, weighs in favor of applying the ministerial exception here. Although Fratello did not accept a formal call to

religious service, *cf. id.* at 192, the record discloses that she understood that she would be perceived as a religious leader. The Archdiocese describes acceptance of the principal position as "accept[ing] the vocation and challenge of leadership in Catholic education." Cover Letter from Edward Cardinal Egan (Dec. 2006), at App'x at 110. And when Fratello was applying for the position of principal, she sent her references a recommendation form indicating that she was applying for an "important leadership role" with the Archdiocese. Reference Request, at App'x at 190. Indeed, as principal, Fratello "personif[ied]" the School's "beliefs," *Hosanna-Tabor*, 565 U.S. at 188, inasmuch as she presented herself to the School community and the public as a spiritual leader. She led school prayers, conveyed religious messages in speeches and writings, and expressed the importance of Catholic prayer and spirituality in newsletters to parents.

### D. Functions Performed

In our view, the most important consideration in this case is whether, and to what extent, the plaintiff "performed" "important religious functions . . . for [her religious organization]." *Hosanna-Tabor*, 565 U.S. at 192. We think the record establishes beyond doubt that, as principal, Fratello "convey[ed]" the School's Roman Catholic "message and carr[ied] out its mission," *id.*, insofar as she:

(1) consistently managed, evaluated, and worked closely with teachers to execute the School's religious education mission; (2) led daily prayers for students over the loudspeaker, and other prayers at various ceremonies for faculty and students; (3) supervised and approved the selection of hymns, decorations, and lay persons chosen to recite prayer at annual special Masses; (4) encouraged and supervised teachers' integration of Catholic saints and religious values in their lessons and classrooms; (5) kept families connected to their students' religious and spiritual development through the newsletter; and (6) delivered commencement speeches and yearbook messages that were religious in nature.

Not only did Fratello perform all these functions, she was also evaluated on the quality of that performance. Her supervisors and faculty commended her earlier in her tenure for "setting a good example as a religion leader" and "making religious values . . . the focus of life at the School." Daley Decl. ¶ 25, at App'x at 107. They also praised her for "foster[ing] a Christian atmosphere," "giv[ing] priority to a comprehensive religious education program" by "encouraging communal worship," "ensur[ing] that religion classes [were] taught by knowledgeable and committed Catholics," and "provid[ing] for religious growth among staff members." Pastor Evaluation at 1-2, at App'x at 198-99; *see*

*also* Driscoll Evaluation at 1, at Supp. App'x at 113; Sister Lewis Evaluation at 1, at Supp. App'x at 119; Sister Connolly Evaluation at 1, at Supp. App'x at 133; McGuirk Evaluation at 1, at Supp. App'x at 143; Ladolcetta Evaluation at 1, at Supp. App'x at 157; Murphy Evaluation at 1, at Supp. App'x at 189.

Thus, Fratello "performed" several "important religious functions" as the School's principal. *Hosanna-Tabor*, 565 U.S. at 192.[34] This fundamental consideration therefore weighs strongly in favor of applying the ministerial exception.

* * *

The irony is striking. We rely in part on Fratello's supervisors' and faculty officials' prior *praise* of her performance of her religious responsibilities as proof that she could be fired for the wrong reason or without any reason at all. In our

---

[34] We do not think it is material in this case that Fratello also performed many secular administrative duties such as "[p]ersonnel [m]anagement," "[o]ffice [m]anagement," "[p]ublic and [c]ommunity [r]elations," "[b]udget and [f]iscal [m]anagement," "[t]eacher [d]evelopment," and "[e]valuation of [s]tudents," Manual ¶¶ 324, 326, at App'x at 134-35, because the "ministerial exception" is not "limited to those employees who perform exclusively religious functions"; even "[t]he heads of congregations . . . have a mix of duties, including secular ones." *Hosanna-Tabor*, 565 U.S. at 193 (internal quotation marks omitted). Indeed, the majority of the *Hosanna-Tabor* plaintiff's responsibilities were secular. *See id*. (noting that her "religious duties consumed only 45 minutes of each workday").

47

inquiry, the nature of her duties trumps her apparent ability to perform them.

This case thus lies at the center of the tension between an employer's right to freedom of religion and an employee's right not to be unlawfully discriminated against. The ministerial exception, as we understand it to be interpreted by the Supreme Court, resolves that tension in this case against Fratello and in favor of the Archdiocese, the Church, and the School. Indeed, the Supreme Court has told us that, because, as we conclude, she is a minister within the meaning of the exception, the "First Amendment has struck the balance for us." *Id*. at 196.

## CONCLUSION

In sum, then, we conclude that although Fratello's formal title was not inherently religious, the record makes clear that she held herself out as a spiritual leader of the School and performed many important religious functions to advance its Roman Catholic mission. The ministerial exception thus bars her employment-discrimination claims because she was a minister within the meaning of the exception. We therefore AFFIRM the judgment of the district court.