# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term, 2016

(Argued: January 9, 2017    Decided: March 7, 2018)

Docket No. 16-474-cv

_____

MARLON PENN,

*Plaintiff-Appellant,*

–v.–

NEW YORK METHODIST HOSPITAL, PETER POULOS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of New York
No. 11-cv-9137 – Nelson S. Román, *Judge.*

_____

Before: HALL, DRONEY, *Circuit Judges,* AND BOLDEN, *District Judge.**

_____

---

* Judge Victor A. Bolden, of the United States District Court for the District of
Connecticut, sitting by designation.

Marlon Penn appeals from a January 21, 2016 order of the United States District Court for the Southern District of New York (Román, J.), granting summary judgment for the Defendants. Mr. Penn—a former duty chaplain at New York Methodist Hospital—brought a lawsuit alleging that New York Methodist Hospital and Peter Poulos discriminated against him on the basis of his race and religion, and retaliated against him after he filed charges with the U.S. Equal Employment Opportunity Commission and the New York City Commission on Human Rights. New York Methodist Hospital, because of its history and continuing purpose, through its Department of Pastoral Care, is a "religious group." Mr. Penn's role within the Department of Pastoral Care was to provide religious care to the hospital's patients and religious care only. Therefore, the First Amendment's Religion Clauses warrant the application of the ministerial exception doctrine and the dismissal of this lawsuit. The decision of the district court is **AFFIRMED**.

JUDGE DRONEY dissents in a separate opinion.

> VINCENT IHEKE EKE-NWEKE, Law Offices of Vincent I. Eke-Nweke, P.C., Brooklyn, NY, *for the Plaintiff-Appellee*
>
> A. JONATHAN TRAFIMOW, Julia Gavrilov, Moritt Hock & Hamroff LLP, Garden City, NY, *for the Defendants-Appellees*

———————————————

BOLDEN, *District Judge*:

In *Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017), this Court recently addressed the Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012), adopting the "ministerial exception" doctrine and recognizing that the First Amendment protects religious employers from employment discrimination lawsuits brought by their ministers.

This case requires us to address the doctrine once again and determine whether a hospital—only historically connected to the United Methodist Church but still providing religious services through its pastoral care department—can invoke it. We hold that it can.

Between 2004 and 2011, Marlon Penn worked at the New York Methodist Hospital ("NYMH") as a Duty Chaplain. Peter Poulos, as Director of the Pastoral Education Program and the Department of Pastoral Care, supervised Mr. Penn's employment. In November 2011, NYMH and Mr. Poulos terminated Mr. Penn's employment. On December 12, 2011, Mr. Penn filed suit, bringing claims under Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the anti-discrimination laws of both the State and City of New York. Defendants-Appellees moved for summary judgment, arguing that the Establishment and Free Exercise Clauses of the First Amendment barred Mr. Penn's claims. The district court (Nelson Román, Judge), granted summary judgment. We affirm.

## I.  BACKGROUND

### A. The History of New York Methodist Hospital

Founded in 1881 at the "behest" of a Methodist minister and with financing from a Methodist philanthropist, Joint App'x at 383, the United Methodist Church

established NYMH, the first Methodist hospital in the world. Joint App'x at 108-110. In 1975, however, NYMH amended its Certificate of Incorporation to remove all reference to its "Church related character" and "relationship with The United Methodist Church." Joint App'x at 43. It also deleted from the Certificate of Incorporation the requirement that the Bishop of the New York area United Methodist Church and the President of the Guild of the Methodist Hospital be "trustees ex-officio." Joint App'x at 293, 401. Now, NYMH's Articles of Incorporation do not mention religious activity or a religious mission. Instead, the Articles state that "the purpose of the corporation is to establish, maintain, operate and conduct a hospital including an infirmary, dispensary or clinic for the medical and surgical aid, care and treatment of persons in need thereof." Joint App'x at 292.

NYMH also promotes its secular nature. For example, the "Welcome Letter" from Executive Vice President Stanley Sherbell to new medical residents at NYMH, which is published on the hospital's webpage, calls the hospital a "secular institution." Joint App'x at 353. Additionally, NYMH "downsized" its "Department of Church Relations" about fifteen years ago, according to Lyn Hill, NYMH's Vice President of Communication and External Affairs**.** Joint App'x at

393. The record also reveals that NYMH does not have a formal relationship with the United Methodist Association of Health and Welfare Ministries. Joint App'x at 433.

Nevertheless, vestiges of NYMH's religious heritage remain. It has steadfastly kept the word "Methodist" in its name, despite organizational and operational changes. In 1993, for example, NYMH became affiliated with the New York-Presbyterian Health Care system, but continued to call itself a "Methodist" hospital. Joint App'x at 51. More than twenty years ago, but after the amendment of NYMH's Certificate of Incorporation, the United Methodist Association Journal observed that "the [hospital's] Methodist influence can still be seen in the hospital through the philosophy of equality, individual attention, charity, faith, and hope that is communicated to NYMH employees every day." Joint App'x at 108-10. The article also highlighted the hospital's Methodist archives project, the twenty-four hour service provided by the pastoral care department, and the memorial plaque in front of NYMH commemorating its "status as the first Methodist hospital in the world." *Id.*

In 2006, NYMH produced a booklet commemorating its 125th anniversary and noted "its identity as the mother hospital of Methodism." Joint App'x at 60.

The Hospital's current Employee Handbook also emphasizes this history, Joint App'x at 68, and states that its mission is "to provide an active ecumenical program of pastoral care and conduct[] a clinical pastoral program." Joint App'x at 67.

NYMH's by-laws continue to require "significant representation from the community and the United Methodist Church" on its Board of Trustees. Joint App'x at 56; Joint App'x at 84-85. When Mr. Penn filed suit, three of NYMH's seventeen Board members, including the Chairman, were Methodist ministers. Joint App'x at 383. The three ministers did not serve as representatives of the Church on the Board of Trustees, however, and NYMH could not identify how exactly they were appointed. Joint App'x at 351. The by-laws further require NYMH to select a president "with the advice and counsel of the Bishop of the New York area of the United Methodist Church." Joint App'x at 56. The Order of Business in the by-laws also mandates that every regular Board meeting begin with prayer. Joint App'x at 56, 89.

NYMH has retained significant aspects of its religious heritage in other ways. At the hospital's employee orientation, Chaplain Peter Poulos reminds every employee that "patients are human beings who are created in the image of God." Joint App'x at 52. Additionally, the hospital has a "pastor's clinic" for

6

several week-long sessions each year, where it offers free health screenings and

educational programming to ten to twelve Methodist ministers and their spouses.

Joint App'x at 383. The hospital also makes a yearly philanthropic appeal to the

"Methodist churches in [its] community." *Id.*

## B.  NYMH's Department of Pastoral Care

This case specifically concerns NYMH's Department of Pastoral Care. The

Department of Pastoral Care's mission is to provide an "ecumenical program of

pastoral care" to patients and to "see that the needs of the whole person—mind

and spirit as well as body—are met." Joint App'x at 356. Appellee Peter Poulos is

the director of the Department and also directs its pastoral training program. Joint

App'x at 358.

Staff Chaplains at NYMH counsel patients, including those who are making

end-of-life decisions, and "facilitate the patient's receiving [of] the rituals and

practices of his/her own faith tradition when requested." Joint App'x at 363. A

chaplain in the Department of Pastoral Care is required:

- To minister to patients, their families, and staff in his/her assigned

  patient units in accordance with the protocols and procedures of the

  Department of Pastoral Care;

- To facilitate the patient's receiving the rituals and practices of his/her own faith tradition when requested;

- To counsel patients and families, who struggle with how their faith/belief systems influence the way they deal with hospitalization and decisions they may need to make;

- To counsel patients, families and staff as they deal with experiences of significant change, grief and loss;

- To offer prayer, ritual, devotional materials to patients and families when requested; and

- To participate in coordinating and conducting chapel services as requested by the Director (holiday services, employee memorial services, Sunday worship services, etc.).

Joint App'x at 407.[1] According to Vice President Hill, every chaplain is considered "clergy." Joint App'x at 43. Formal ordination is not a requirement for chaplaincy,

---

[1] There are two chaplain roles—Duty Chaplain and Staff Chaplain—in the Department of Pastoral Education at NYMH. According to Defendants, Duty Chaplains "primarily . . . respond[] to pages". Joint App'x at 172. Staff Chaplains, on the other hand, "affirmatively contact new patients on the floor, and take the initiative to make sure all patients in their units are aware of the Department and the services it provides." *Id*. Mr. Penn held the role of both Staff Chaplain and Duty Chaplain at various points. *See* Joint App'x at 252.

but a Staff Chaplain must have a Master's Degree in Divinity or equivalent and four units of Clinical Pastoral Education credits at any accredited training center. Joint App'x at 368.

The Department of Pastoral Care seeks to accommodate various faiths. Joint App'x at 80; Joint App'x at 363 (agreeing to the statement "if it is necessary, you can get a chaplain from any religion, even if the hospital does not have such a chaplain on staff"). It maintains religious spaces for non-Methodists and coordinates the "hospital's meeting the different needs of the religious denominations represented in our patient population." Joint App'x at 359.

The Department of Pastoral Care is integrated into NYMH's non-pastoral work. At times, it coordinates religious events for non-pastoral staff. Mr. Poulos stated that he is often asked to say prayers at the opening of "ceremonies, graduations, [and] employee recognition [events]," and that he leads an orientation on Methodism for new staff. Joint App'x at 362. Additionally, representatives of the Department sit on NYMH's "interdisciplinary committees" for bioethics and "hospice/palliative care," as well as the institutional review board for research projects. Joint App'x at 367.

### C. Mr. Penn's Employment at NYMH

Marlon Penn, an African-American Methodist, served as a Chaplain Trainee (or "Resident Chaplain") at NYMH's Clinical Pastoral Education Residency Program from January 2002 to July 2004. Joint App'x at 439. In July 2004, NYMH hired him as a Duty Chaplain. As Mr. Penn readily admits, he was "primarily responsible for ministry" in this role. Joint App'x at 238. He also coordinated the distribution of Bibles, conducted an in-hospital memorial service for an employee who died, and "maintained . . . active, on-going pastoral care to staff." *Id.*

During his tenure at NYMH, Mr. Penn "repeatedly requested" that NYMH promote him to a full-time Staff Chaplain position. Joint App'x at 449. Despite these requests, NYMH never promoted Mr. Penn. In September 2006, NYMH hired Rabbi Spitz as a full-time Staff Chaplain, without interviewing Mr. Penn. In August 2010, the hospital once again sought a full-time chaplain, this time to replace Sister Therese Camardella. *Id.*; Joint App'x at 446. Mr. Penn expressed interest in the position. Mr. Poulos initially tried to replace her with a Catholic and mentioned this to Mr. Penn. When he could not find a viable Catholic candidate, Mr. Poulos offered the position to Joo Hong, who was not Catholic. *Id.*; Joint App'x at 450. Mr. Poulos stated that he chose Ms. Hong because she "received very

10

positive feedback" from other chaplains and educators. *Id*. Mr. Poulos had also

"witnessed her strong counseling skills from first hand observation." *Id*.

Mr. Poulos said that he did not consider Mr. Penn for the Staff Chaplain

position for several reasons. One resident had complained to Mr. Poulos that Mr.

Penn ended a service with a hymn that was only familiar to a certain group of

Christians. Appellee's Br., 13-14. Mr. Poulos and Mr. Penn also disagreed about

the importance of "full coverage." *Id*. According to appellees, this was a

"philosophical" disagreement, because Mr. Penn felt that "effective ministry to

those in pain/crisis is never contingent on . . . time constraints," Joint App'x at 207

(summarizing Mr. Penn's rebuttal statement at the New York Human Rights

Commission), and Mr. Poulos disagreed. Nevertheless, during the course of his

employment, NYMH also commended Mr. Penn for being "conscientious,"

"reliable," and "helpful." Joint App'x at 239.

On September 26, 2010, Mr. Penn filed an administrative complaint with the

New York City Commission on Human Rights ("CCHR") and the U.S. Equal

Employment Opportunity Commission ("EEOC"), alleging that Appellees had

failed to promote him because of his race and religion. Joint App'x at 457. He also

alleged that Appellees failed to reasonably accommodate his religious beliefs,

because they did not allow him to take time off on Sunday mornings to attend church services in Mount Vernon, New York. *Id*. On July 27, 2011, the CCHR dismissed the complaint, concluding that there was "insufficient evidence to substantiate [Mr. Penn's] allegations of discrimination." Joint App'x at 209. On September 22, 2011, the EEOC sent Plaintiff a notice of right to sue, adopting the findings of the CCHR. *Penn v. N.Y. Methodist Hosp.*, No. 11-cv-9137 (NSR), 2013 WL 5477600, at *2 (S.D.N.Y. Sept. 30, 2013).

After Mr. Penn filed his administrative complaint, Appellees allege, his performance at work began to deteriorate. Appellees pointed to many instances of misconduct. On March 13, 2011, Mr. Penn improperly completed a "referral card," which resulted in a patient dying without receiving last rites. Appellee's Br. at 14 (citing "The Anointing Incident"). On the same day, a woman whose fetus had died complained about Mr. Penn's counseling because he commented on her partner's race. *Id*. at 15 ("The Fetal Demise Incident"). At an Easter Service in 2011, Mr. Penn told a Catholic nurse that she could not receive communion until the following day, although he purportedly knew that she could receive communion across the street. *Id*. at 16 ("The April 11, 2011 Easter Service").

Finally, in November 2011, a Resident Chaplain complained to Mr. Poulos that Mr. Penn made sexually inappropriate comments to her and hugged her against her will. Joint App'x at 484-94. After this incident, NYMH's Human Resources Department initiated an investigation into the complaint and eventually decided to end Mr. Penn's employment. Joint App'x at 505.

### D. Procedural History

On December 12, 2011, Mr. Penn filed suit in the United States District Court for the Southern District of New York. In his second amended complaint, he asserted that Appellees: (1) discriminated against him on the basis of his race and religion, in violation of Title VII of the Civil Rights Act of 1964 (against NYMH only), and 42 U.S.C. § 1981 (against both Appellees), and (2) retaliated against him after he filed charges with the EEOC and the Human Rights Commission, in violation of Title VII, § 1981, and various state and city laws. *See Penn*, 2013 WL 5477600, *1-2.

On September 30, 2013, the district court partially granted Appellees' motion to dismiss by: (1) dismissing Plaintiffs claims under 42 U.S.C. § 1981 for discrimination on the basis of his race and religion as against both Appellees; (2) dismissing Mr. Penn's Title VII claim against NYMH with respect to

discriminatory actions that occurred before November 12, 2009, as time barred, and (3) dismissing his claim under Title VII for discriminatory termination of employment on the basis of race or religion. *See generally Penn*, 2013 WL 5477600. The court also concluded that "the well-pleaded allegations in the Complaint, accepted as true, show[ed] that [Mr. Penn] was a ministerial employee," but observed that the allegations did not conclusively establish that "NYMH [wa]s a religious institution or religiously-affiliated." *Id.* at *6, *9.

On July 8, 2015, Appellees moved for summary judgment, asserting that the ministerial exception barred all of Mr. Penn's remaining claims, and, in the alternative, that no reasonable jury could find for Mr. Penn on his claims of discrimination and retaliation. The district court granted the motion, concluding that the ministerial exception applied. *Penn v. N.Y. Methodist Hosp.*, 158 F. Supp. 3d 177 (S.D.N.Y. 2016). In addressing the issue of "whether NYMH is a 'religious institution' for purposes of the ministerial exception," *id.* at 182, the court followed the reasoning of another district court decision, *Musante v. Notre Dame of Easton Church*, 3:01-CV-2352 (MRK), 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004), and concluded that the "ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both

considered in determining whether the exception applies." *Id.* (citing *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) ("The more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes.")).

The district court noted that "where an employee's role is extensively religious, a less religious employer may still create entanglement issues." *Penn*, 158 F. Supp. 3d at 182. Since Mr. Penn's role at NYMH was "pervasively religious[,] application of the ministerial exception to a less religious institution [was] warranted." *Id.* The district court further held that NYMH's amendment of its Certificate of Incorporation "sever[ed] all formal ties with the United Methodist Church," but did not "necessarily imply that the Hospital d[id] not maintain any church-based relationship or have any religious characteristics." *Id.* at 182-83. Indeed, the district court recognized NYMH's "connection with the United Methodist Church," its mission statement which "emphasize[d] an 'ecumenical program of pastoral care,'" and Mr. Penn's own religious identification as a Methodist and deemed these undisputed facts sufficient to warrant the application of the ministerial exception. *Id.* at 184.

This appeal followed.

## II.   STANDARD OF REVIEW

We review *de novo* a grant of summary judgment under Fed. R. Civ. P. 56, assessing whether the district court properly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *See Ruggiero v. City. of Orange*, 467 F.3d 170, 173 (2d Cir. 2006). While "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," we are "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

The purpose of the ministerial exception is to "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' . . .—is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 194-95 (2012)(quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)); *see also Fratello v. Archdiocese of New York*, 863 F.3d 190, 199 (2d Cir. 2017) (describing the roots of the ministerial exception in the colonial struggle against a "national church"). The ministerial exception "operates as an affirmative defense to an

otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at

195 n.4.

As this Court has previously recognized, "[i]t is the relationship between

the activities the employee performs for her employer, and the religious activities

the employer espouses and practices, that determines" whether the exception

applies. *Fratello*, 863 F.3d at 205-06. Additionally, as both the Supreme Court and

this Court have acknowledged, there is no "rigid formula for deciding when" the

exception applies. *Hosanna-Tabor*, 565 U.S. at 190; *see also Fratello*, 863 F.3d at 204-

05 (considering four factors identified in *Hosanna-Tabor* to evaluate whether

individual was a minister within the meaning of the exception, but noting the

Supreme Court "instructs only as to what we *might* take into account as relevant .

. . it neither limits the inquiry to those considerations nor requires their application

in every case.").

Applying these principles here and construing all evidence in the light most

favorable to Mr. Penn, *see Ruggiero*, 467 F.3d at 173, the district court did not err in

applying the ministerial exception doctrine.[2] While a close question, NYMH,

---

[2] Appellant also argued that the district court erred by (1) admitting an unauthenticated copy of NYMH's by-laws into evidence, Appellant's Br. at 58; (2) failing to consider caselaw interpreting the Religious Freedom Restoration Act (RFRA) and Title VII's

because of its history and continuing purpose, through its Department of Pastoral

Care, is a "religious group," and since Mr. Penn's role within the Department of

Pastoral Care was to provide religious care to the hospital's patients and religious

care only, the ministerial exception doctrine should be applied.[3] Once applied, its

application warrants this lawsuit's dismissal. Any other conclusion risks violating

the First Amendment's Religion Clauses, most specifically the Establishment

Clause.

**A. The Application of the Ministerial Exception Doctrine**

While the *Hosanna-Tabor* decision made clear that the ministerial exception

applies to "religious groups" when making employment decisions involving

"ministers," *see Hosanna-Tabor*, 565 U.S. at 196, the Supreme Court did not "adopt

---

exemption for "religiously affiliated" employers, *id.* at 28; and (3) considering the "sliding scale" test referenced in *Musante*, 2004 WL 721774, at *6, and *Rweyemamu*, 520 F.3d at 208. We do not need to reach these issues. Nor do we need to address Appellee's argument that RFRA separately bars this case.

[3] The dissent reaches the opposite conclusion. *See Dissent* at 18-19 ("Because there is insufficient evidence that NYMH's mission is marked by clear or obvious religious characteristic, I conclude that it does not qualify as a religious institution for purposes of the ministerial exception." (citation and internal quotation marks omitted)). Paradoxically, although the NYMH's Department of Pastoral Care indisputably is dedicated to the religious concerns of the hospital's patients by providing and supervising chaplains to address their specific religious needs, the dissent would hold that it is not a "religious group." As discussed below, this outcome is neither required nor recommended by the prevailing law.

a rigid formula for deciding when an employee qualifies as a minister," noting only that "the ministerial exception is not limited to the head of a religious congregation." *Id*. at 190. The Supreme Court also did not explain how to define a "religious group" to determine who could properly invoke the exception. *Id*. at 188 (referencing a "religious group's right to shape its own faith and mission through its appointments"). Nevertheless, consistent with the Supreme Court's guidance in *Hosanna-Tabor* and this Court's recent ruling in *Fratello*, NYMH is a "religious group," at least with respect to its Department of Pastoral Care.

Both before and after *Hosanna Tabor*, other circuits have applied the ministerial exception in cases involving "religiously affiliated entit[ies]," whose "mission[s are] marked by clear or obvious religious characteristics." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (quoting *Shaliehsabou v. Hebrew Home of Greater Wash.*, 363 F.3d 299, 310 (4th Cir. 2004)). In *Shaliehsabou*, the Fourth Circuit allowed a Jewish nursing home to invoke the ministerial exception because its "by-laws define[d] it as a religious and charitable non-profit corporation and declare[d] that its mission was to provide elder care to 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs.'" *Id.* at 310; *see also Conlon*, 777 F.3d at 833-34 ("It is undisputed that

InterVarsity Christian Fellowship is a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities. It is therefore a 'religious group' under *Hosanna-Tabor*.'').

Courts have also allowed hospitals to invoke the ministerial exception doctrine in employment suits from pastoral staff members. *See Hollins v. Methodist Healthcare*, 474 F.3d 223, 226 (6th Cir. 2007) ("We agree with this extension of the rule beyond its application to ordained ministers and hold that it applies to the plaintiff in this case, given the pastoral role she filled at the hospital."), *rev'd in part on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4; *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362 (8th Cir. 1991) ("It cannot seriously be claimed that a church-affiliated hospital providing this sort of ministry to its patients is not an institution with substantial religious character. . . . While St. Luke's provides many secular services (and arguably may be primarily a secular institution), in its role as Scharon's employer it is without question a religious organization.") (citations omitted); *see also Shaliehsabou*, 363 F.3d at 310-11 ("Pursuant to [its] mission, the Hebrew Home maintained a rabbi on its staff, employed mashgichim to ensure compliance with the Jewish dietary laws, and placed a mezuzah on every resident's doorpost. Although we do not have to decide the full reach of the phrase

20

'religious institution,' we hold that the phrase includes an entity such as the Hebrew Home.").

Mr. Penn argues, however, that NYMH is not a religious institution. He maintains that the hospital is no longer affiliated with the United Methodist Church. Indeed, NYMH took steps to distance itself from its religious heritage. Its by-laws no longer require the hospital to seek permission from the United Methodist Church to make significant business decisions, *see Hollins v. Methodist Healthcare*, 379 F. Supp. 2d 907, 909 (W.D. Tenn. 2005), nor do they give the United Methodist Church the power to veto any amendment to the hospital's articles of incorporation, *Scharon*, 929 F.2d at 362 (adding that "[t]he hospital's Board of Directors consists of four church representatives and their unanimously agreed-upon nominees").

Furthermore, NYMH's Methodist identity does not infuse its performance of its secular duties, making it less clear that its "mission is marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310-11 (observing that the defendant nursing home required staff to comply with religious laws while administering healthcare, hung a mezuzah on each patient's doorway, and stated in its by-laws that its mission was to serve the "aged of Jewish faith"). Except for

the several days a year when it offers free pastoral care, NYMH's Methodist affiliation does not pervade its work as a healthcare organization. Mr. Penn also emphasizes that, as the district court acknowledged in its ruling on NYMH's motion to dismiss, "many secular hospitals have chaplains and accredited clinical pastoral education programs." *Penn*, 2013 WL 5477600, *8.

These arguments, however, ignore how the hospital's Department of Pastoral Care operates and how these operations are "marked by clear or obvious religious characteristics." *Conlon*, 777 F.3d at 834. The Department of Pastoral Care required chaplains, like Mr. Penn, to distribute Bibles, perform religious rituals and organize and conduct religious services, including Easter services and memorial services. While NYMH may have shed significant aspects of its religious identity by amending its Certificate of Incorporation, the hospital's Department of Pastoral Care has retained a critical aspect of that religious identity in order to provide religious services to its patients. These services, while not limited to those who are Methodist, are indisputably religious.[4] Mr. Penn himself acknowledges as

---

[4] The dissent does not argue that the Department of Pastoral Care is not engaged in legitimate religious activities, but instead disregards these religious activities because they are not "Methodist." *See Dissent* at 10-11 (noting, *inter alia*, that its mission statement "is 'ecumenical,' i.e., not Methodist;" its "website does not mention the Methodist faith;" and "[n]one of the three full-time chaplains of the Hospital's Department of Pastoral Care

much. *See Penn*, 2013 WL 5477600, at *6 (alluding to Mr. Penn's Complaint, in which he states that he coordinated the distribution of Bibles to all patient units, performed an in-hospital memorial service for an employee who died, performed Easter Services and communion and "maintain[ed] an active, on-going Pastoral care to staff").

In its ruling on summary judgment, the district court determined that "the relationship between Plaintiff and NYMH (specifically, the Department of Pastoral Care) was that of a religious employee and a religious institution." *Penn*, 158 F. Supp. 3d at 184 (limiting its decision by noting that it was made "insofar as Plaintiff is a Methodist and was responsible—at least in part—for preaching the Christian faith"). While Mr. Penn challenges whether the "obvious religious

---

are Methodist;" and expecting "its director to be Methodist, or for at least one of its permanent chaplains to be Methodist . . . ."). As a result, the dissent finds that "NYMH's mission and operations are not 'marked by clear or obvious religious characteristics.'" *Id.* at 11 (quoting *Shaliehsabou*, 363 F.3d at 310). The dissent, however, cites no precedent for the proposition that the Department of Pastoral Care's embrace of religious traditions beyond Methodism disqualifies it from constitutional protection under the Constitution's Religion Clauses, and to inquire whether this ecumenical approach to pastoral care is consistent with Methodism, simply "plunge[s the Court] into a maelstrom of Church policy, administration, and governance," *Rweyemamu*, 520 F.3d at 209 (citation and internal quotation marks omitted), something this Court has expressly prohibited. *See id.* at 209-10; *see also Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 427 (2d Cir. 2002); *Catholic High Sch. Ass'n of the Archdiocese v. Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985).

characteristics" of his work and the NYMH satisfy the legal standard of being a

"religious group," he does not and cannot dispute that he performed religious

services for NYMH's Department of Pastoral Care and, thus, served that

department's religious purpose. The district court therefore properly applied the

ministerial exception because the Department of Pastoral Care within the NYMH

had the "obvious religious characteristics" of a "religious group" and employed

Mr. Penn as a minister. [5]

## B. This Application of the Ministerial Exception Doctrine Properly Recognizes the Establishment Clause's Prohibition Against Excessive Entanglement With Religion

This application of the ministerial exception doctrine, that the NYMH's

Department of Pastoral Care is a "religious group," one consistent with the

relevant precedent and this case's undisputed facts, properly balances the

constitutional consequences of not doing so: the risk of excessive entanglement

---

[5] Because this Court's ruling is premised on the NYMH having been a religiously-affiliated entity and having retained a sufficient portion of its identity in the specific operation of the Department of Pastoral Care, this Court does not and need not reach the issue of whether hospitals, secular in their origins and with chaplaincies, also could properly invoke the ministerial exception. "There will be time enough to address the applicability of the exception to other circumstances if and when they arise." *Hosanna-Tabor*, 565 U.S. at 196; *see also PDK Laboratories Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting the "cardinal principle of judicial restraint – if it is not necessary to decide more, it is necessary not to decide more . . .").

with "ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188-89 (observing that judicial interference with the selection of ministers violates the Establishment Clause, which "prohibits government involvement in . . . ecclesiastical decisions" to protect against the establishment of religion).

As this Court has recognized, "*Hosanna-Tabor* made clear that the First Amendment does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action." *Fratello*, 863 F.3d at 204. This Court explained that "a court is virtually never the place[] to analyze the grounds for a religious group's reasons for selecting its ministers," *id*. at 204 n.26, because a judge is ill-equipped even to assess whether a particular claim is a religious one. It is clear, therefore, that the purpose of the exception is "not to safeguard a church's decision to fire a minister only when it is made for a religious reason," but rather to protect a church's autonomy to "select[] those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188-89. In other words, rather than focus on the claims at issue in an employment discrimination case, *Hosanna-Tabor* instructs us to review the employee and the employer and assess the religious characteristics of each.

Our inquiry therefore must consider the Establishment Clause, which forbids "an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) (citation omitted); *see also Scharon*, 929 F.2d at 362 ("To decide this question, we apply another three-part test set out by the Supreme Court in *Lemon*. . . . Scharon argues that St. Luke's is not a religious institution and that she was a secular employee, not 'clergy.' She therefore claims that the application of Title VII and the ADEA would not require excessive government entanglement with religion. Scharon's assertions, however, are untenable."). While *Hosanna-Tabor* did "leave open the possibility that some employment-discrimination claims by ministers might not be barred if excessive entanglement could be avoided in the particular case," *Fratello*, 863 F.3d at 202, where excessive government entanglement with religion is involved, it follows that employment discrimination claims by ministers must be barred.

Indeed, this Court in *Rweyemamu* clarified the important constitutional issues behind the ministerial exception doctrine. There, a Catholic priest filed suit against the local Bishop and Diocese, alleging employment discrimination in violation of Title VII. The Court observed that a "lay employee's relationship to his employer may be 'so pervasively religious' that judicial interference in the form

26

of a discrimination inquiry could run afoul of the Constitution." *Rweyemamu*, 520 F.3d at 208 (citing *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993)). In order to prevail on his Title VII claim, the priest had to argue that the Catholic Church's decision to fire him was "not only erroneous, but also pretextual." *Id.* The ministerial exception applied because the Court was neither permitted nor equipped to evaluate Rweyemamu's pretext argument. *Id.*

As the Court noted: "[H]ow are we, as Article III judges, to gainsay the Congregatio Pro Clericis' conclusion that [Rweyemamu] is insufficiently devoted to ministry? How are we to assess the quality of his homilies?" *Id.* at 209; *see Bronx Household of Faith v. Bd. of Educ. of N.Y.C.*, 750 F.3d 184, 199 (2d Cir. 2014) ("[A]t the very least . . . the Establishment Clause prohibits government from appearing to take a position on questions of religious belief.") (citations omitted); *see also Commack*, 294 F.3d at 425 (holding that the challenged kosher fraud laws "excessively entangle government and religion because they . . . take sides in a religious matter [and] require the State to take an official position on religious doctrine.").[6]

---

[6] Even before *Rweyemamu*, this Court had recognized that courts are prohibited "from inquiring into an asserted religious motive to determine whether it is pretextual." *Culvert*, 753 F.2d at 1168.

27

This case presents that precise challenge. Any evaluation of Mr. Penn's claims would require the Court to examine whether NYMH's explanation of its failure to promote him, and for his eventual termination, was "not only erroneous, but also pre-textual." *Rweyemamu*, 520 F.3d at 209. As "legitimate non-discriminatory reasons" for their failure to promote Mr. Penn, NYMH argues that Mr. Penn ended a service with a hymn that was only familiar to a certain group of Christians, spent too much time counseling each patient, was insensitive to non-Christian patients, and failed to attend meetings. When Mr. Poulos selected Ms. Hong over Mr. Penn for promotion to Staff Chaplain, Mr. Poulos concluded that Ms. Hong had "strong[er] counseling skills" and was, in short, a better pastor. Joint App'x at 174. To explain its decision to fire Mr. Penn—the decision that he challenges as retaliatory—NYMH claims that Mr. Penn improperly completed a "referral card," which resulted in a patient dying without receiving last rites, inappropriately counseled a couple after a fetal demise, misrepresented the availability of an Easter Service to a Catholic nurse, and triggered complaints about sexual harassment from a Resident Chaplain.

Any jury hearing Mr. Penn's employment discrimination and retaliation claims therefore would have to determine how a minister should conduct religious

28

services or provide spiritual support. Jurors would have to measure the importance of a patient's last rites, a chaplain's selection of a particular hymn, and a Catholic's access to Communion. They would need to evaluate whether it was appropriate for the Department of Pastoral Care to seek out a Catholic chaplain or to fire an employee who did not accommodate Catholic nurses. They would have to consider the disagreement between Mr. Poulos and Mr. Penn on the appropriate length of pastoral counseling sessions—a "philosophical difference," according to NYMH—and compare Mr. Penn's pastoral skills to Ms. Hong's. Appellee's Br. at 37.

Any of these decisions, all indisputably necessary to the adjudication of Mr. Penn's claims—even if intertwined with some secular concerns—"would plunge [the Court] into a maelstrom of Church policy, administration, and governance," *Rweyemamu*, 520 F. 3d at 209 (citing *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989) (internal quotation marks omitted), and risk "government involvement in . . . ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 171.[7] This Court has cautioned that judges are "ill-equipped to assess whether,

---

[7]The dissent argues that "the interfaith nature of the Department means that it is not run according to the tenets of any particular religion, thereby reducing the likelihood that evaluating the reasons for the termination of an employee such as Penn would 'plunge

and to what extent, an employment dispute between a minister and his or her religious group is premised on religious grounds." *Fratello*, 863 F.3d at 203. And, when a court is asked to "take sides in a religious matter," *Commack*, 294 F.3d at 425, the court must dismiss the case. *See Culvert*, 753 F.2d at 1168 (recognizing that "the First Amendment prohibits . . . [the courts] from inquiring into an asserted religious motive to determine whether it is pretextual."). Following these principles, this case must be dismissed.

## IV. CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.

---

[a court] into a maelstrom of Church policy, administration, and governance." *Dissent* at 18 (quoting *Rweyemamu*, 520 F.3d at 209). In doing so, the dissent glosses over core Establishment Clause issues in two significant ways. First, as discussed above, *see Slip Op.* at 23 n.4, by determining that the NYMH's Department of Pastoral Care's ecumenical approach to pastoral care is inconsistent with Methodism, the dissent has already crossed the permissible constitutional line and begun defining "Church policy, administration, and governance." Second, because the Department of Pastoral Care serves the diverse spiritual needs of its patients, it thus must be cognizant of and sensitive to "Church policy, administration, and governance" of many faith perspectives and not just one. If not, it risks trivializing, if not disrespecting, the genuine religious beliefs of its patients. *See* Joint App'x at 407 (requiring NYMH chaplains "[t]o facilitate the patient's receiving the rituals and practices of his/her own faith traditions when requested"). In other words, "the interfaith nature of the Department" means more entanglement with "Church policy, administration, and governance,"—not less.

DRONEY, *Circuit Judge*, dissenting:

The majority holds that a secular hospital with minimal vestiges of its religious lineage may assert the Religion Clauses of the First Amendment to block claims of racial and religious discrimination by a former employee. I respectfully dissent. The majority has set the bar far too low for employers to claim religious-based immunity from federal anti-discrimination law.

## I. The Religion Clauses of the First Amendment and the Ministerial Exception

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. "[T]he Religion Clauses ensure[] that the . . . Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices. The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 184 (2012). To give force to these protections for religious institutions as employers, the lower federal courts created and applied the "'ministerial exception,' a doctrine that precludes, on First Amendment grounds, employment-discrimination claims by 'ministers'

1

against the religious organizations that employ or formerly employed them."

*Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 192 (2d Cir. 2017). The exception

"addresses a tension between two core values underlying much of our

constitutional doctrine and federal law: equal protection and religious liberty." *Id.*

at 198. In *Hosanna-Tabor*, the Supreme Court endorsed this doctrine because

> [r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Hosanna-Tabor*, 565 U.S. at 188–89.

In order for a defendant-employer to claim the protections of the ministerial

exception, two distinct requirements must be met: (1) the plaintiff must be a

minister; and (2) the defendant must be a religious institution. *See Hosanna-Tabor*,

565 U.S at 188–89 (holding that the ministerial exception "precludes application of

[civil rights] legislation to claims concerning the employment relationship *between*

*a religious institution and its ministers*" (emphasis added)); *Fratello*, 863 F.3d at 198

2

(noting that "[t]he ministerial exception bars employment-discrimination claims brought by *ministers* against the *religious groups* that employ or formerly employed them" (emphasis added)); *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 235 (6th Cir. 2007) ("In order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee."), *abrogated in part on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4. Accordingly, "the [ministerial] exception does not apply to the religious employees of secular employers or to the secular employees of religious employers." *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 307 (4th Cir. 2004).[1]

Because Penn does not challenge that he is a "minister" for the purposes of the ministerial exception, it is only necessary to resolve whether New York Methodist Hospital ("NYMH") qualifies—today—as a "religious institution."

---

[1] Despite the frequent use of the term "minister" in analyzing the ministerial exception, an employee performing certain religious functions need not be an ordained minister to qualify as a "minister" for purposes of the exception. *See, e.g., Fratello*, 863 F.3d at 206–09 (holding that the lay principal of a Catholic school was a "minister" for purposes of the ministerial exception); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177–80 (5th Cir. 2012) (holding that the music director at a Catholic church qualified as such a "minister").

## II. The Meaning of "Religious Institution"

It is clearest that an institution is a "religious institution" when it is "a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization," *Hollins*, 474 F.3d at 225, as was the case for the church-operated schools in both *Fratello* and *Hosanna-Tabor*.

Today, the majority joins the Fourth Circuit in holding that "a religiously affiliated entity is a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310. While I agree that this approach is consistent with the Supreme Court's guidance in *Hosanna-Tabor*, I disagree with the majority's application of it to the hospital defendant here.[2]

---

[2] The majority does not set forth factors for a court to consider in determining whether an organization qualifies as a "religious institution," as "marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310. In the related Title VII religious exemption context, the Third Circuit has set forth the following factors in determining whether an organization is religious:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of

## III.    NYMH is not a "Religious Institution"

There is no question that in 1881, when the Methodist Hospital of Brooklyn was founded by a Methodist minister and a Methodist benefactor, it was a religiously-affiliated entity subject to the protections of the First Amendment religion clauses.  There is also no dispute that it continued to be a religiously-affiliated institution for many years.  However, since at least the 1970s, the hospital has shed almost all of its religious character.

The majority acknowledges many of the undisputed facts set forth below, but concludes that they do not show that NYMH is no longer a religious institution.

---

worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007).  The Ninth Circuit has held that an entity qualifies for the Title VII religious exemption when, at least, it "[1] is organized for a religious purpose, [2] is engaged primarily in carrying out that religious purpose, [3] holds itself out to the public as an entity for carrying out that religious purpose, and [4] does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts." *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam).  If these factors were applied to NYMH, they would weigh against NYMH being considered a "religious institution."

The evolution of NYMH's Certificate of Incorporation shows that NYMH almost entirely eliminated its ties with the United Methodist Church. The original Certificate of Incorporation is not in the record. However, a 1973 amendment "delete[d] the requirement that each of [four] classes [of trustees] contain a bishop of the Methodist Episcopal Church," although the Bishop of the New York Area of The United Methodist Church and the President of the Guild of Methodist Hospitals remained on the board of trustees *ex officio.* App. 257, 259. The Certificate's statement of purpose then indicated that in addition to performing typical hospital healthcare functions, "[t]he corporation in maintaining its Christian genesis and its Church related character in the performance of its functions shall nurture a meaningful and effective relationship with The United Methodist Church and its participating boards, institutions and congregations." App. 258.

But, in 1974, the Certificate was again amended "to delete provisions relating to the [hospital's] relationship with The United Methodist Church." App. 269. The amendment also removed the Bishop of the New York Area of the United States Methodist Church and the President of the Guild of Methodist Hospitals from the board of trustees, and deleted the language from the 1973 amendment

6

regarding "maintaining its Christian genesis and its Church related character" and "nurturing a meaningful and effective relationship with the United Methodist Church" from its statement of purpose. App. 269–70.

Although the current chair of the Hospital Board is a Methodist minister, only three of its seventeen trustees are Methodist ministers, and NYMH has conceded that they (including the chair) "do[] not . . . represent any unit of the United Methodist Church [in their role] on the Hospital Board of Trustees." App. 351.[3] There is also no evidence in the record that the Methodist Church retains any influence over any part of the Hospital's day-to-day or long-term operations. Nor is there evidence that Methodist religious doctrine guides NYMH or its Department of Pastoral Care's operations.[4]

---

[3] The majority cites to provisions of the NYMH by-laws that state that the Board shall "include significant representation from the community and the United Methodist Church" and select its president after consulting with a Methodist bishop. Slip. Op. at 6 (quoting App. 87). However, Penn objects to the consideration of those by-laws because they are unauthenticated. The majority does not resolve that objection. In any event, those provisions contradict the 1974 amendment to the Certificate of Incorporation, as well as NYMH's admissions that the Methodist ministers on the Board (including the chair) "do[] not . . . represent any unit of the United Methodist Church [in their role] on the Hospital Board of Trustees." App. 351.

[4] In 1993, NYMH became a member of the New York Presbyterian Healthcare Network, now New York-Presbyterian Healthcare System. There is no evidence that this membership imposed any type of Presbyterian (or Methodist) doctrinal requirements on NYMH, and the defendants do not argue that NYMH is a Presbyterian religious institution.

There is also evidence that NYMH holds itself out to the public as a secular institution. *See Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) (considering whether an institution "holds itself out to the public as an entity for carrying out [a] religious purpose" as a factor in determining whether the related Title VII religious exemption applies); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (considering "whether [an] entity holds itself out to the public as secular or religious" as a factor in determining whether the Title VII religious exemption applies). In materials distributed to candidates for its internal medicine residency program, NYMH self-identifies as a "secular institution." App. 340, 347 ("Founded in 1881, New York Methodist Hospital is the oldest of the 78 hospitals that were founded by the United Methodist Church. The Hospital, *now a secular institution*, is located in the Park Slope neighborhood of Brooklyn, New York." (emphasis added)). A NYMH webpage directed to residency candidates also states that NYMH is "now a secular institution." App. 353 ("New York Methodist Hospital, founded in 1881, is the oldest of the seventy-eight hospitals that were founded by the United Methodist Church. *Now a secular institution*, the Hospital became affiliated with New York-Presbyterian Hospital and the Weill Cornell Medical College in 1993." (emphasis added)).

8

In its mission statement, NYMH describes itself as "a *non-sectarian*, voluntary institution . . . [with] an historic relationship with the United Methodist Church." App. 67 (emphasis added).

The mission statement sets forth six "primary objectives:"

- To make services accessible to patients and physicians without regard to age, sex, race, creed, national origin, or disability;
- To provide patients with an environment that assures the continuous enhancement of patient safety;
- To provide an active ecumenical program of pastoral care and to conduct a clinical pastoral education program;
- To offer an environment that is responsive to new and changing technologies and management principles that will stimulate creative solutions for our patients, physicians and employees;
- To assess periodically the healthcare needs of the community and to respond to those these needs with healthcare services, including health education for patients and community residents;
- To work with members of the New York-Presbyterian Healthcare System and other healthcare institutions, physicians and community groups in jointly pursuing the delivery of quality healthcare services, medical education and clinical research.

*Id.*

In describing its primary objectives, NYMH's mission statement does not refer to the United Methodist Church or Methodism. Only one of the six objectives

9

contains any reference to religion, the reference to the pastoral care department. However, the pastoral care department, according to the mission statement, is "ecumenical," i.e., not Methodist.

Indeed, the description of the Department of Pastoral Care on NYMH's website does not mention the Methodist faith. The purpose of the Department is, according to NYMH's website, "[t]o see that the needs of the whole person—mind and spirit as well as body—are met." App. 356. The Department is "an essential feature of NYM's holistic approach to healthcare." *Id*. Chaplains at NYMH "can come from any faith tradition," and "will visit all patients on their assigned units regardless of their patients' religious affiliations." *Id*. If patients have faith-specific needs, the Department is "ready to connect patients and their families with the specific rituals and services offered by their particular faith group." *Id*. For example, the Department can "arrange for a Roman Catholic Eucharistic minister to bring communion . . . or . . . to perform an anointing of the sick." *Id*. Three places of worship are available at the hospital: a Christian chapel, a Jewish prayer room, and a Muslim prayer room.

None of the three full-time chaplains of the Hospital's Department of Pastoral Care are Methodist. Defendant Peter Poulos, its Director, is Greek

Orthodox. The second is a rabbi, and the third a non-Methodist Protestant. If the Department were in fact Methodist-oriented, one would expect its director to be Methodist, or for at least one of its permanent chaplains to be Methodist.

Finally, the Department runs a Clinical Pastoral Education ("CPE") residency program to train chaplains, typically training between three and six residents at a time. Between 2008 and 2011, Poulos hired 23 residents into the CPE program. Of those 23, only one was Methodist.

In sum, NYMH's mission and operations are not "marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310. While many religious hospitals, schools or other entities could certainly qualify as religious institutions and receive the protections of the ministerial exception, NYMH is no longer such a religious institution.

This case is easily distinguishable from those in other circuits where courts have applied the ministerial exception to bar suits by employees of entities related to religious institutions.

For example, in *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, the Eighth Circuit decided that St. Luke's, "a church-affiliated hospital," was entitled to invoke the ministerial exception in an age and sex discrimination case brought by

a former member of the hospital's Department of Pastoral Care. 929 F.2d 360, 361–63 (8th Cir. 1991). St. Luke's Board of Directors "consist[ed] of four church representatives and their unanimously agreed-upon nominees," and "its Articles of Association [could] be amended only with the approval of the Episcopal Diocese of Missouri of the Protestant Episcopal Church in the United States of America and the local Presbytery of the Presbyterian Church." *Id.* at 362. The plaintiff, an ordained Episcopal priest employed as a chaplain at the hospital, was fired—"with the advice and consent of the Episcopal Bishop"—for "violating several canonical laws." *Id.* at 361.[5]

In *Shaliehsabou*, the Fourth Circuit concluded that a Jewish nursing home—the Hebrew Home of Greater Washington—was a religious institution for the purposes of the ministerial exception to the Fair Labor Standards Act, which it deemed to be "coextensive" with the ministerial exception. 363 F.3d at 306. The nursing home's mission, "according to its By-Laws, [was] to serve aged of the Jewish faith in accordance with the precepts of Jewish law and customs, including the observance of dietary laws." *Id.* at 301 (internal quotation marks omitted). The

---

[5] In *Hollins v. Methodist Healthcare*, cited by the majority as another case where a hospital was allowed to invoke the ministerial exception, the issue of whether the hospital was a religious institution was expressly not before the court; the plaintiff had forfeited the right to argue that the hospital was not. 474 F.3d 223, 226 (6th Cir. 2007).

home maintained a synagogue onsite with twice daily services, each resident's room had Jewish religious items in it, and it maintained an entirely kosher food preparation process. *Id.* The plaintiff—an orthodox Jewish man—supervised the preparation of the kosher food as a mashgiach.[6] *Id.* at 301.

In *Conlon v. Intervarsity Christian Fellowship*, the Sixth Circuit held that "an evangelical campus mission serving students and faculty on college and university campuses nationwide" was entitled to invoke the ministerial exception. 777 F.3d 829, 831 (6th Cir. 2015). The group's "vision [was] to see students and faculty transformed, campuses renewed and world changers developed," and its purpose "[was] to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord: growing in love for God, God's Word, God's people of every ethnicity and culture and God's purposes in the world." *Id.* Additionally, the group "believe[d] in the sanctity of marriage and desire[d] that all married employees honor their marriage vows." *Id.* The plaintiff, a "spiritual director" of the group, had been terminated for contemplating divorce from her husband. *Id.* at 832. Divorce violated the policy of the group requiring all married employees to "honor their marriage

---

[6] A mashgiach is an inspector who ensures that Jewish dietary laws are followed. *Id.* at 301.

vows." *Id.* at 831. The court found dispositive to the "religious organization" inquiry that the group's purpose was, as the court explained it, "to advance the understanding and practice of Christianity in colleges and universities." *Id.* at 834.

In contrast, neither Methodist doctrine nor Methodist Church leadership have a significant role at NYMH. While NYMH may still have some limited religious aspects—for example, Board meetings begin with a prayer and all employees are reminded that "patients are human beings who are created in [the] image of God," App. 51 (alteration in original),—it is not nearly as pervasively religious as entities that other Courts of Appeals have deemed sufficiently religious to warrant application of the ministerial exception.

While NYMH began as a Methodist hospital, it no longer is; it is a modern, secular hospital that serves a diverse group of patients in Brooklyn. Indeed, the majority acknowledges that Methodism does not "infuse [NYMH's] performance of its secular duties" or "pervade its work as a healthcare organization." Slip Op. at 22. Nevertheless, the majority concludes that NYMH is a religious institution by focusing its analysis solely on the Department of Pastoral Care and Penn's role in it, noting that "[Penn] does not and cannot dispute that he performed religious services for [the Department]." Slip Op. at 24.

I conclude that this focus on the work that Penn did, and on the Department of Pastoral Care, rather than on NYMH as a whole, is incorrect. The district court adopted a similar focus, referring to it as the "sliding scale" approach. The district court reasoned that

> [t]he ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies. . . . [T]he more pervasively religious an institution is, the less religious the employee's role need be in order to risk first amendment infringement." On the other hand, where an employee's role is extensively religious, a less religious employer may still create entanglement issues.

*Penn v. New York Methodist Hosp.*, 158 F. Supp. 3d 177, 182 (S.D.N.Y. 2016) (first alteration in original) (quoting *Musante v. Notre Dame of Easton Church*, No. CIV.A. 301CV2352, 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004)). The district court concluded that "[i]n light of Plaintiff's exceedingly ministerial role, application of the ministerial exception to a less religious institution may be warranted." *Id.*

The origin of the "sliding scale" approach appears to be the district court's opinion in *Musante*. In *Musante*, the plaintiff's employer was a Catholic church in the Diocese of Bridgeport. 2004 WL 721774, at *1. As the church was obviously a religious institution, the only question before the district court was whether the plaintiff, a lay person but the "Director of Religious Education . . . and Pastoral

15

Assistant" for the church, was a "minister" for purposes of the ministerial exception. *Id.* It was in the context of answering this question—not determining whether the *employer* was a religious institution—that the district court noted that "the ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies." *Id.* at *6. The district court noted that "as employees of religious institutions such as churches and synagogues are likely to be inherently involved in religious activity to a much greater degree than, for example, employees of *religiously affiliated hospitals* or charitable institutions, regardless of the nature of the employees' specific responsibilities." *Id.* (emphasis added).

In support of its application of the sliding scale approach to determining whether NYMH is a religious institution, the district court below also relied on language from our decision in *Rweyemamu v. Cote* indicating that "[t]he more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes." 520 F.3d 198, 208 (2d Cir. 2008). However, this statement does not justify the application of a sliding scale approach to determining whether an institution is religious. *Rweyemamu* used that

language in discussing when an employee "is functionally a 'minister'" for purposes of the ministerial exception, not whether the defendant there—the Roman Catholic Diocese of Norwich—is religious. *Id.*

In order for the ministerial exception to apply, two distinct conditions must be met: the plaintiff must be a minister and the defendant must be a religious institution. Indeed, "the exception does not apply to the religious employees of secular employers or to the secular employees of religious employers." *Shaliehsabou*, 363 F.3d at 307. Accordingly, no matter how religious the role of the employee—indeed, even if the employee is in fact a minister performing religious functions—the ministerial exception will not apply unless the employer is a religious institution. While the sliding scale approach may be useful in determining whether an employee is a "minister," it has no application to determining whether an institution is religious.

Penn and the other members of the Department of Pastoral Care are, at most, "religious employees of [a] secular employer[]." *Id*. The presence of a non-sectarian chaplaincy department cannot transform an otherwise secular hospital into a religious institution for purposes of the ministerial exception. If it could, most hospitals would be exempt from anti-discrimination laws, as most—even

clearly secular hospitals—have chaplaincy departments.[7]  Wendy Cage, et al., *The Provision of Hospital Chaplaincy in the United States: A National Overview*, 101 S. Med. J. 626, 628–29 (2008).  Moreover, the interfaith nature of the Department means that it is not run according to the tenets of any particular religion, thereby reducing the likelihood that evaluating the reasons for the termination of an employee such as Penn would "plunge [a court] into a maelstrom of Church policy, administration, and governance."  *Rweyemamu*, 520 F.3d at 209.

Because there is insufficient evidence that NYMH's "mission is marked by clear or obvious religious characteristics," *Shaliehsabou*, 363 F.3d at 310, I conclude that it does not qualify as a religious institution for purposes of the ministerial exception.[8]

---

[7] The Department of Pastoral Care is not an entity separate from NYMH and entitled to a separate analysis as to whether it is a religious institution.  That Department is one of many at the Hospital.  Poulos, its head, did not have the authority to terminate Penn.  The investigation regarding whether to terminate Penn was conducted by the Hospital's Human Resources Department.  There is no evidence that the Human Resources Department is religious.  The ultimate decision to terminate Penn was made by the Hospital's Vice President, Dennis Buchanan, with the recommendation of Kay Moschella, the Director of Employee Relations in the Human Resources Department; Moschella made clear that Poulos did not make the decision to terminate Penn, as it "was not his decision to make."  Aff. of Kay Moschella at 6, *Penn v. New York Methodist Hospital*, No. 11-cv-9137 (S.D.N.Y. July 28, 1015), ECF No. 99.

[8] Citing *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006), Appellees argue that the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b), provides an alternate basis for affirming the district court, even though this suit is between private

## IV.    Conclusion

For the reasons stated above, I would vacate the district court's grant of

summary judgment on the basis of the ministerial exception, and remand to the

district court for further proceedings.

---

parties.  The majority does not reach this argument.  While Appellees provide support for their argument that RFRA could bar the suit, they raise no argument regarding why RFRA applies in this particular case.  For example, they do not argue that the suit "substantially burden[s] [their] exercise of religion." 42 U.S.C. § 2000bb–1.  Accordingly, I would find that Appellees have abandoned any argument that RFRA bars this suit. *See State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned.").